**CANFIELD AVIATION, INC.,**
Petitioner,

v.

**NATIONAL TRANSPORTATION SAFETY BOARD and T. Allan McArtor, Administrator, Federal Aviation Administration, Respondents.**

No. 88–4096.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1988.

---

Lawrence B. Smith, Tucson, Ariz., for petitioner.

Karen R. Bury, Peter J. Lynch, FAA, Donald D. Engen, Admin., FAA, Washington, D.C., for FAA and Nat. Transp. Safety Bd.

Before KING, JOHNSON and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this case, Canfield Aviation, Inc. makes several constitutional challenges to the revocation of its operating certificate by the National Transportation Safety Board ("NTSB"). Specifically Canfield alleges that the statutes and administrative regulations used against it violated the corporation's due process rights and operated as a bill of attainder against one employee, Reynald Crete, who was denied permission to serve as Canfield's director of operations and chief pilot because of his prior involvement with an air-taxi company whose license had been revoked. Because we find that Canfield lacks standing to assert Crete's constitutional rights, we decline to address this issue. With respect to Canfield's own claims, we find that the administrative proceedings met all necessary due process requirements, especially when considered in the light of the obvious public safety concerns involved in air traffic regulations. Accordingly, we affirm the order of the NTSB.

I

Canfield Aviation, Inc., is an air-taxi company ("ATCO") which operates in Houston, Texas, under a Federal Aviation Regulation ("FAR") § 135 air-taxi certificate. In August 1987, the company was sold to Reynald Crete (former director of Cash Air, Inc.), Edward Desmet and Sandra Fournier.[1]

---

1. Although Desmet, not Crete, is listed as sole shareholder and officer of Canfield, Desmet has no qualifications for owning or managing an ATCO and is apparently Crete's employee.

Later that month, Canfield began to use one airplane to make nightly runs carrying newspapers from Chicago to various points in the midwest. This route was the subject of an investigation by Otis Key, an FAA operations inspector. Key discovered through his investigation that the pilot on that flight, Steven Rochna, was not properly qualified and that by using him, Canfield had violated several FAA regulations. Key also learned of Crete's involvement in Canfield and that Crete's former business, Cash Air, Inc., had closed because its operating certificate had been revoked on an emergency basis.

Meanwhile, pursuant to the new ownership of Canfield Air, the corporation applied to amend its section 135 operating certificate by making Crete the new director of operations and chief pilot. Key determined that Crete had "materially contributed" to the reasons for the revocation of Cash Air's operating certificate and advised his superior to deny Canfield's application for that reason, pursuant to FAR 135.13(b).[2] Because Crete did not meet the eligibility requirements of FAR Section 135.13(b) and was the only owner of the corporation who was a pilot, the FAA determined that Canfield did not currently have a qualified director of operations or chief pilot. For that reason, Canfield, Inc., did not meet the eligibility requirements of FAR Section 135.37,[3] and on November 2, 1987, the FAA issued an emergency order revoking Canfield's operating certificate. Canfield appealed to the NTSB and the

revocation order was filed as a complaint in this proceeding. The FAA filed a motion for partial summary judgment because it claimed Mr. Crete had materially contributed to the reasons for the revocation of Cash Air's operating certificate. Cash Air had initially appealed that emergency order of revocation but withdrew its appeal on December 7, 1987. The Cash Air emergency order was attached to the FAA's motion for partial summary judgment in the proceedings against Canfield Aviation. The ALJ denied the FAA's motion for partial summary judgment.

A three-day administrative hearing was held before the NTSB administrative law judge ("ALJ"). At the hearing, Canfield presented only one witness, pilot Steven Rochna. On cross-examination the government asked Rochna not only about his work at Canfield, but also about the operations of Cash Air, where he had previously been employed. In its case-in-chief the government presented its own evidence through the testimony of another Cash Air pilot to show that Cash Air's operation was dangerous and that Crete had materially contributed to the hazardous operation of that company. The government also presented documents and witness testimony from two FAA agents regarding alleged safety violations by Canfield.

After the evidence was presented the ALJ affirmed the FAA's emergency order of revocation. In that decision he referred specifically to the charges made against Pilot Rochna and noted that there was an

---

Crete admitted in his depositions that he actually "runs" the business and is a part-owner.

**2.** 14 C.F.R. § 135.13(b) states in pertinent part:
   (b) The Administrator may deny any applicant a certificate under this part if the Administrator finds—
   . . . .
   (2) That a person who was employed in a position similar to general manager, director of operations, director of maintenance, chief pilot, or chief inspector, or who has exercised control with respect to any ATCO operating certificate holder, air carrier, or commercial operator whose operating certificate has been revoked, will be employed in any of those positions or a similar position, or will be in control of or have a substantial ownership interest in the applicant, and that the person's

employment or control contributed materially to the reasons for revoking that certificate.

**3.** Section 135.37 states in pertinent part:
   (a) Each certificate holder ... must have enough qualified management personnel in the following or equivalent positions to ensure safety in its operations:
   (1) Director of operations.
   (2) Chief pilot.
   (3) Director of maintenance.
   (b) Upon application by the certificate holder, the Administrator may approve different positions or numbers of positions than those listed in paragraph (a) of this section for a particular operation if the certificate holder shows that it can perform its operations safely under the direction of fewer or different categories of management personnel.

obvious similarity and connection between the Cash Air violations and the operation of Canfield Aviation. He found that for all practical purposes, Mr. Crete was the sole operator and motivating force in both companies and continued to show poor judgment in his management of Canfield Air. Canfield then appealed the ALJ's decision to the full NTSB. The NTSB upheld the judge's decision and affirmed the order of revocation.

## II

This appeal is a review of the order by the NTSB pursuant to section 1006(a) of the Federal Aviation Act. Canfield raises several issues on appeal. First, Canfield claims that the FAA's application of FAR § 135.13 operates as a bill of attainder against Mr. Crete since it effectively denies him the right to own or operate an aircraft corporation because of his previous involvement with Cash Air, without first affording him notice or opportunity to challenge the FAA's decision that Cash Air was improperly run or that he was materially responsible for its operation.

Canfield further challenges the application of section 135.13 in this revocation proceeding, arguing that by its own terms section 135.13 relates only to applications for, not revocation of, operating certificates. Finally, Canfield claims that its due process right to adequate notice was violated when the government presented evidence at the hearing concerning the charges that led to the revocation of Cash Air's certificate—charges against which, Canfield claims, it could not prepare to defend itself.

## III

■ Canfield's first argument is that the FAA's Rule 14 C.F.R. § 135.13 has been applied as a bill of attainder against Crete. The FAA's emergency revocation of Canfield's operating license was based in part upon the NTSB's ruling that Crete, who was not a named party to the revocation proceeding, had materially contributed to

the reasons that Cash Air's certificate had been revoked, and that he was consequently unqualified to serve Canfield in a similarly responsible position. Canfield argues that the application here of this provision in section 135.13 effectively "blacklists" Crete by permanently preventing him from holding a managerial position in any air taxi operation, without providing him an opportunity for a hearing on the underlying alleged misconduct for which he is blamed. This regulation, according to Canfield, therefore operates as a bill of attainder against Crete, violating Article I of the Constitution.[4]

Regardless of the possible merits of this argument, however, it is inarguable that the constitutional rights being asserted here belong to Crete as an individual, not to Canfield, the corporation. We lack jurisdiction to address the issue unless Canfield has proper standing to assert Crete's rights. We hold that it does not.

■ In order to maintain standing to raise a claim in federal court, (1) the plaintiff must allege an injury in fact, that creates a sufficiently concrete interest in the outcome of the suit to make it a case or controversy and (2) the plaintiff must be the proper proponent of the particular legal rights upon which the suit is based. *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). When examining standing issues in cases such as the one here, courts must be sure (1) that the litigant and the person whose rights he asserts have interests which are aligned; (2) that the litigant is as effective a proponent of that right as the third party; and (3) that the third party lacks the ability to assert his own right. *Singleton,* 428 U.S. at 114–15, 96 S.Ct. at 2874–75.

Canfield claims that it has suffered an injury in fact because denying Crete the ability to serve as chief operating director has affected its own property rights to own and operate a business and its property interest in its operations license. Any economic injury to Canfield in this case, however, could be resovled by simply appoint-

---

**4.** A bill of attainder is "a legislative act that applies to a named individual or group in such a way as to inflict punishment without a judicial trial." *Black's Law Dictionary.*

ing a new director or chief operating pilot. Furthermore, we find absolutely no evidence to indicate that Crete lacks· the ability to assert his own rights. Crete, as the primary force behind *both* Cash Air and Canfield, certainly had notice of the events that caused the ALJ to rule that he could not serve on Canfield's board. . Crete also had an opportunity to assert his own rights, first when Cash Air's license was revoked and then at this revocation hearing, because the NTSB's regulations specifically provide for intervenors.[5] Furthermore, as a practical matter, we do not ignore the fact that Crete, as essentially an alter ego to Cash Air and a major force behind Canfield, had an opportunity to determine the scope of the evidence and defenses presented in the proceeding, regardless of intervention rules. Crete was present at the entire hearing before the ALJ in this case, yet Canfield made absolutely no attempt to call him as a witness to defend his conduct at Cash Air, nor did Crete personally make any effort to defend himself against the charges he was hearing from the witness stand, which he knew beforehand would be a subject of the hearing. In short, Crete did not lack the opportunity or ability to assert his own right.[6] This case is therefore fully controlled by the principle that "[f]ederal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation," *Singleton*, 428 U.S. at 113, 96 S.Ct. at 2874, and accordingly we hold that Canfield lacks standing to raise this issue concerning Crete's constitutional rights. We turn therefore to those issues Canfield raises on its own behalf.

## IV

Canfield raises several constitutional challenges on appeal. We will discuss each one individually.

### A.

Canfield first claims that section 135.13, one of the rules that the ALJ applied in revoking Canfield's certificate, applies on its face only to the application for a certificate and not to the revocation of a certificate already granted. (*See* footnote 2 for text.) In this case, however, the ALJ actually revoked Canfield's operating certificate pursuant to provisions of 14 C.F.R. 135.37 (*see* footnote 3 for text). Furthermore, 49 U.S.C.App. § 1429 permits the Secretary of Transportation to reinspect any civil air agency and issue an order amending or revoking any airworthiness certificate "if he determines that safety in air commerce or air transportation and the public interest requires." It is true that of these provisions, only 135.13 refers to the employment of a person such as Crete as a disqualification for a certificate. That section, however, is entitled "Eligibility for Certificate and Operations Specifications" and obviously relates to eligibility qualifications for all certificates, whether new or existing. But as we have noted, the certificate was not revoked because of the disqualification found under 135.13. Although the decisions below are not the most precisely stated, the ALJ and NTSB effectively denied Canfield's *amendment* (to allow Crete to be its chief operating officer) pursuant to section 135.13. Then, because Canfield had no one to fill Crete's place, it lacked the required qualified management to operate, and section 135.37 was applied to *revoke* the certificate. Thus, Canfield's argument fails because the certificate was not revoked on the basis of section 135.13. We therefore reject Canfield's contention and hold that the ALJ and NTSB did not erroneously apply section 135.13 to revoke Canfield's certificate.

### B.

▮ Canfield also complains that its due process rights were violated when it was

---

**5.** 49 C.F.R. § 821.9 states in pertinent part:·
   Any person may move for leave to intervene in a proceeding and may become a party thereto, if the law judge finds that such person may be bound by any order to be entered in the proceeding, or that such person has a property, financial, or other legitimate interest which may not be adequately represented.

**6.** We also note, however, that our decision here is not intended to be an endorsement of the constitutionality of the FAA regulations. On the contrary, in view of the government's refusal to take a position on whether ˙this statute *could* operate as a bill of attainder, we do not suggest whether a different plaintiff might prevail on a constitutional challenge to 14 C.F.R. § 135.13.

forced to litigate issues concerning Cash Air's eligibility for an operating certificate and whether Mr. Crete materially contributed to the reasons for revoking that certificate. They concede that the emergency order that was later filed as a complaint in the proceedings against them did state that their certificate was to be denied in part based upon the previous revocation of Cash Air's operating certificate and upon Mr. Crete's performance there. They claim, however, that this did not give them sufficient notice as to which particular incidents that occurred at Cash Air would be used against them at their trial and that they were therefore required to "use telepathy" in order to determine how to prepare their case. Specifically, they claim that the government should have notified them that it intended to cross-examine Steven Rochna regarding his prior involvement with Cash Air and to call a second pilot of Cash Air in the government's case-in-chief.

It is, of course, very nearly axiomatic that "some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). Furthermore, an interest in a certificate or license that is a prerequisite to employment is a cognizable property interest, protectable by the procedural due process requirement of the Fifth Amendment, as both parties agree. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 566, 92 S.Ct. 2701, 2703, 33 L.Ed.2d 548 (1972). In essence, the basic elements of constitutional procedural due process rights are notice and the opportunity to be heard. *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

The purpose of notice in a case such as this is to apprise the affected individual of, and permit adequate preparation for, an impending hearing. *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 14, 98 S.Ct. 1554, 1562–63, 56 L.Ed.2d 30 (1978). In this instance, the government's notice fully informed Canfield of the allegations against it and provided an adequate opportunity for Canfield, if it so chose, to

prepare its defense. Canfield was provided not only with the charges made against it, but also with those charges made against Cash Air that would be presented to the court. The notice given in the emergency order was thus sufficient. Constitutional due process simply does not require that Canfield be notified of each witness and each item of evidence that the agency intended to use to prove its case.

Furthermore, Canfield's argument that it was improperly forced to litigate issues concerning Cash Air's eligibility for an operating certificate is without merit. The question presented in Canfield's revocation hearing is not whether Cash Air's certificate was properly revoked, but whether Canfield's close connection to Cash Air was evidence that the operation of Canfield threatened public safety. Similarly, Canfield could have defended against any taint it sustained by its involvement with Crete, by proving either that Crete did not materially contribute to Cash Air's certificate revocation, or that it could still qualify for an ATCO without Crete. It apparently chose to do neither. Again, the notice was sufficient to permit Canfield to defend itself on this issue. It had notice of the charges against Cash Air and notice that those charges were a very significant basis for the emergency revocation order. Crete was present at the hearing and could have been called as a witness with respect to Cash Air's operation. Canfield simply failed to present any evidence on this issue at the ALJ's hearing, or before the full Board. Canfield cannot now claim, therefore, that it was denied the opportunity to be heard on this issue simply because it failed to take advantage of that opportunity.

C.

Finally, Canfield argues that because of the emergency revocation, its business operations were closed before it had an opportunity to substitute a qualified director of operations for Crete in order to qualify for its operating certificate. Canfield therefore requests that we remand this case to the FAA and direct it to consider further

whether Canfield can qualify for an operating certificate. At oral argument, the government conceded that the immediate enforcement of the emergency revocation order made it impossible for Canfield to attempt to comply with the FAA's requirement that Crete be removed from control of the corporation. Therefore, assuming that Crete can be removed from control of Canfield and it can secure a new director of operations and chief pilot so that the requirements of section 135.13(b) are satisfied, we will remand this case to the administrative body for reconsideration, so that the agency can determine whether this change in the certificate is sufficient to justify FAA approval in the light of the other findings made against Canfield.

## V

For the foregoing reasons, the order of the NTSB is affirmed in part, but this case is remanded for further consideration not inconsistent with this opinion.

AFFIRMED IN PART AND REMANDED FOR FURTHER PROCEEDINGS.