**FAIR EMPLOYMENT COUNCIL OF GREATER WASHINGTON, INC., et al., Appellees,**

v.

**BMC MARKETING CORPORATION, t/a Snelling & Snelling Personnel Consultants, Appellant.**

**No. 93–7190.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1994.

Decided July 19, 1994.

John Gibson Mullan, Washington, DC, argued the cause for appellant. With him on the briefs were John S. Irving and Michael P. McDonald, Washington, DC.

Joseph M. Sellers, Washington, DC, argued the cause for appellees. With him on the brief were Roderic V.O. Boggs, Andrew T. Karron and Patricia H. Anderson, Washington, DC. Mark A. Kass, Joseph E. Schmitz, Lisa B. Fowler and Barbara B. Brown, Washington, DC entered an appearance.

On the brief for amicus curiae E.E.O.C., was Samuel A. Marcosson, Attorney, E.E.O.C., Washington, DC.

Before: SILBERMAN, WILLIAMS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge, STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

While attending college, plaintiffs Ernest A. Tuckett III and William Demps, Jr. also worked as "testers" for the Fair Employment Council of Greater Washington. In December 1990, both Tuckett and Demps, who are black, were paired with white testers also employed by the Council. On successive days, the two pairs of testers—equipped with fake credentials intended to be comparable—sought employment referrals from BMC Marketing Corporation, which runs an employment agency in the District of Columbia. Both times the white tester received a referral and the black tester did not; indeed, BMC allegedly refused even to accept an application from one of the two black testers. On the basis of these tests, the Council and the two black testers sued BMC in federal district court, alleging that BMC has "a pattern, practice and policy of employment discrimination on the basis of race". The plaintiffs asserted claims under two different federal statutes—42 U.S.C. § 1981 and 42 U.S.C. § 2000e—and one local statute. They sought declaratory and injunctive relief as well as damages of various sorts.

BMC moved to dismiss the complaint for want of standing. The district court denied the motion but granted BMC leave to take an interlocutory appeal under 28 U.S.C. § 1292(b), 829 F.Supp. 402; we permitted the appeal. We affirm in part and reverse in part. While the Fair Employment Council can maintain a portion of its suit, the individual testers cannot.

## I. The Individual Testers

### A. Federal Claims

Neither of the federal statutes that they invoke gives the tester plaintiffs a cause of action for damages, and they lack standing to seek the other forms of relief requested.

#### 1. Claims for Damages

##### a. 42 U.S.C. § 1981

Section 1981 gives all citizens of the United States "the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens", language that the Supreme Court has interpreted to prohibit not only racially discriminatory government interference with private contracting but also purely private discrimination in contracts. *Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976); *Patterson v. McLean Credit Union*, 491 U.S. 164, 171–75, 109 S.Ct. 2363, 2369–72, 105 L.Ed.2d 132 (1989). The testers assert that BMC violated their rights under this statute in two distinct ways: it deprived them of the opportunity to enter into contracts *with BMC* for employment referrals, and it deprived them of the opportunity to enter into *employment* contracts on referral by BMC. In the context of this case, however, neither assertion states a valid claim under § 1981.

As for the first assertion, BMC denies that it enters into contracts with the people who seek referrals from it. The plaintiffs respond that this argument assumes factual matters that should be dealt with in further proceedings. But even if BMC sometimes *does* enter into contracts with job-seekers, the testers here made conscious and material

misrepresentations of fact by deceiving BMC about their intentions and by presenting BMC with fictitious credentials. Any resulting contracts between the tester plaintiffs and BMC would have been voidable at BMC's option, as the plaintiffs appear to recognize. See, e.g., Rest. (2d) of Contracts § 164(1) (1981). Even on the plaintiffs' argument, then, BMC did not deny the testers the opportunity to enter into a contract that they could have enforced.

■ Certainly the loss of the opportunity to enter into a *void* contract—i.e., a contract that *neither* party can enforce—is not an injury cognizable under § 1981, for a void contract is a legal nullity. From the perspective of the party who obtains a contract through misrepresentations, however, it is generally *worse* for the contract to be voidable than for it to be void; in the absence of any kind of ratification, a voidable contract simply gives the other party an *option.* In any event, the rule that contracts obtained through misrepresentations are merely *voidable* rather than void seems designed entirely to protect the *target* of the misrepresentations. We conclude, therefore, that the loss of the opportunity to enter into a contract voidable at the other party's will is not cognizable under § 1981. Cf., e.g., *Kawitt v. United States,* 842 F.2d 951, 953 (7th Cir. 1988) (job obtained by material misrepresentation is not a property right on which constitutional suit may be founded).

■ The plaintiffs' second assertion fails because the testers concededly had no interest in securing a job through BMC. Indeed, they had promised the Council to refuse any offer of employment that they received in conjunction with their testing activities. See Plaintiffs' Rule 108(h) Statement of Genuine Factual Issues (Sept. 18, 1992) at 17; Defendant Snelling & Snelling, Inc.'s Motion to Dismiss and/or for Summary Judgment (June 23, 1992) tab 14 at 17. In depositions, both of the tester plaintiffs confirmed that they would have rejected any job offer obtained through a referral from BMC. Plaintiffs' Statement tab 20 at 92 (Tuckett); Snelling's Motion tab 16 at 233–34 (Demps). At most, then, BMC deprived the tester plaintiffs of the opportunity to *refuse* to enter into an employment contract with BMC's clients. This too is not an injury cognizable under § 1981.

Our conclusion that the tester plaintiffs are not entitled to damages under § 1981 arguably conflicts with decisions of the Third and Eleventh Circuits, but the analysis in those decisions is not directly on point. In *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894 (3d Cir.1977), overruled on other grounds by *Goodman v. Lukens Steel Co.,* 777 F.2d 113 (3d Cir.1985), aff'd, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), the Third Circuit held that fair-housing testers had standing to sue under § 1981 and 42 U.S.C. § 1982, a parallel provision that guarantees all citizens "the same right, in every State and Territory, as is enjoyed by white citizens thereof" to engage in a variety of transactions involving property. *Meyers,* however, addressed exclusively the proposition that a plaintiff's standing is not defeated by the fact that he subjected himself to legal injury solely for the purpose of determining whether his rights would be violated, with the intent to bring suit if they were. Cf., e.g., *Pierson v. Ray,* 386 U.S. 547, 558, 87 S.Ct. 1213, 1219–20, 18 L.Ed.2d 288 (1967); *Evers v. Dwyer,* 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958) (per curiam). *Meyers* did not address whether the testers had in fact suffered any legal injury within the meaning of §§ 1981 or 1982. At most, it simply *assumed* that the testers had a cause of action under those provisions, and it may not have considered the issue at all. See *Meyers,* 559 F.2d at 898.

*Watts v. Boyd Properties,* 758 F.2d 1482 (11th Cir.1985), is similarly unpersuasive. Though the Eleventh Circuit did indicate that fair-housing testers have a cause of action under § 1982 (and hence, presumably, under § 1981), it rested this view chiefly on *Meyers.*

Our conclusion that the tester plaintiffs lack a cause of action under § 1981 is perfectly consistent with *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), which held that black fair-housing testers had standing to sue over alleged violations of § 804(d) of the Fair Housing Act of 1968. There, Congress had

clearly conferred a cause of action on the testers; § 804(d) made it unlawful "[t]o represent to any person because of race . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available", and § 812 provided that "[t]he rights granted by section[ ] . . . 804 . . . may be enforced by civil actions in appropriate United States district courts". See 42 U.S.C. §§ 3604(d), 3612(a). Under these statutory provisions, it did not matter that the testers merely *posed* as potential renters or purchasers; regardless of their intentions, the statute gave them "an enforceable right to truthful *information* concerning the availability of housing". *Havens,* 455 U.S. at 373–74, 102 S.Ct. at 1121 (emphasis added). The question for the *Havens* Court, then, was simply whether Congress could constitutionally confer such a cause of action—i.e., whether the denial of truthful information to testers caused them any "injury in fact". The Court's answer to this constitutional question has no bearing on the proper interpretation of § 1981.

### b. 42 U.S.C. § 2000e–2(b)

The tester plaintiffs also sought damages under Title VII of the Civil Rights Act of 1964. Title VII declares that "[i]t shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race". 42 U.S.C. § 2000e–2(b). After exhausting certain administrative remedies (as the plaintiffs have done), "a person claiming to be aggrieved" by any such practice may sue the offending employment agency in court. *Id.* § 2000e–5(b), (c), (f)(1). This statutory scheme is much more analogous than § 1981 to the provisions of the Fair Housing Act that were at issue in *Havens.*[1] For our purposes, however, the available *remedies* are critically different.

■ Had the tester plaintiff in *Havens* proved her claims, the district court could

have awarded her damages. See 42 U.S.C. § 3612(b); cf. *United States v. Balistrieri,* 981 F.2d 916, 932–33 (7th Cir.1992). At the time of the alleged discrimination against the testers here, however, only *equitable* remedies were available under Title VII. 42 U.S.C. § 2000e–5(g); see also *United States v. Burke,* —— U.S. ——, ——, 112 S.Ct. 1867, 1873–74, 119 L.Ed.2d 34 (1992) (contrasting "the circumscribed remedies available under Title VII" with the remedies available under the Fair Housing Act). The Civil Rights Act of 1991 expanded the remedies available under Title VII, see 42 U.S.C. § 1981a, but the new remedial provisions cannot be applied to conduct occurring before the enactment of the 1991 statute. *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

### 2. Claims for Prospective Relief

■ Since the tester plaintiffs have no cause of action for damages under either § 1981 or Title VII, their federal claims reduce to their request for injunctive or declaratory relief. Yet under *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), they lack standing to seek such prospective relief, for they have *not* made sufficient allegations that they are threatened with any future illegality.

The plaintiff in *Lyons* alleged that Los Angeles police, without provocation, had subjected him to a chokehold that had knocked him unconscious and injured his larynx. In addition to damages, he sought an injunction barring the police from applying such chokeholds in the future. But the Supreme Court held that he had no standing to seek injunctive relief. Despite his allegations of past injury, his standing to seek the injunction "depended on whether he was likely to suffer *future* injury from the use of the chokeholds by police officers". *Id.* at 105, 103 S.Ct. at 1667 (emphasis added). While conceding the possibility that "there will be certain instanc-

---

1. BMC still argues that people who lack a *bona fide* interest in employment—such as testers—lack any cause of action under § 2000e–2(b). The plaintiffs, supported by the Equal Employment Opportunity Commission as *amicus curiae,* dispute this reading of the statute. But because

we agree with BMC's alternative argument that the tester plaintiffs cannot recover damages under Title VII and have no standing to seek the other relief that they request, we need not address the issue.

es in which strangleholds will be illegally applied and injury ... unconstitutionally inflicted upon the victim", the Court thought it "no more than speculation to assert ... that Lyons himself will again be involved in one of those unfortunate instances". *Id.* at 108, 103 S.Ct. at 1668. In short, while Lyons could maintain a suit for damages, he could not maintain his suit for an injunction because he "has made no showing that he is realistically threatened by a repetition of his experience". *Id.* at 109, 103 S.Ct. at 1669. The same rationale, we have observed, would also have kept him from bringing a suit for *declaratory* relief. *Haase v. Sessions,* 835 F.2d 902, 911 (D.C.Cir.1987); see also, e.g., *Golden v. Zwickler,* 394 U.S. 103, 108–10, 89 S.Ct. 956, 959–61, 22 L.Ed.2d 113 (1969); *City of Houston v. Department of Housing & Urban Dev't,* 24 F.3d 1421, 1429 n. 6 (D.C.Cir.1994).

Here, the tester plaintiffs made several different references to future injury in their complaint. In general, however, these future injuries spring entirely from BMC's *past* conduct. See, e.g., Second Amended Complaint ¶ 44 (suggesting that testers will continue to feel embarrassment and humiliation over their treatment during the tests); *id.* ¶ 7. To pursue an injunction or a declaratory judgment, the tester plaintiffs must allege a likelihood of future *violations* of their rights by BMC, not simply future *effects* from past violations. *Lyons* is directly on point, for the Court there denied standing despite the plaintiff's allegation that he continued to fear that he would suffer a fatal chokehold in a future encounter with the police. "The emotional consequences of a prior act", the Court observed, "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Lyons,* 461 U.S. at 107 n. 8, 103 S.Ct. at 1668 n. 8.

Only once in their complaint do the tester plaintiffs even come close to alleging that they will suffer any future illegality at BMC's hands. In their § 1981 count (though not in their Title VII count), they assert that "[u]nless restrained by this Court, defendants will continue to deny, on the basis of race, said plaintiffs and third parties who may be unaware of the defendants' discriminatory conduct[ ] the right to make and enforce contracts for employment." Second Amended Complaint ¶ 50. The reference to third parties, of course, does not help the tester plaintiffs establish standing; to satisfy the requirements of Article III, they must allege that they themselves are likely to suffer future injury. See *Lyons,* 461 U.S. at 108–09, 103 S.Ct. at 1668–69. Nonetheless, the quoted passage constitutes the only conceivable support for the plaintiffs' argument that the complaint contains the requisite claims of future injuries, which they sort into two distinct types.

First, the plaintiffs assert standing on the basis of "BMC's continuing failure to refer Mr. Demps or Mr. Tuckett for employment on account of their race". Appellees' Brief at 36. This allegation, however, does the tester plaintiffs no good; as we explained above, see *supra* part I.A.1.a., BMC's refusal to act on the testers' applications does not violate § 1981. And even if we import the same allegation into the plaintiffs' Title VII count, the facts as alleged by the plaintiffs would not make out a continuing violation of Title VII either. The tester plaintiffs sought referrals from BMC solely on the basis of their fictitious credentials and their misrepresentations about their desire for jobs. Now that BMC is aware of the deception, it surely has no duty to continue to consider the testers for employment referrals.

The plaintiffs also claim that their complaint, fairly read, raises "the possibility that as people entering the job market or as testers they will in the future seek job referrals from BMC". Appellees' Brief at 36. But nowhere does the complaint assert that the tester plaintiffs are likely *ever* to return to BMC seeking employment referrals, let alone that they will do so at any point "in the reasonably near future". Cf. *Lyons,* 461 U.S. at 108, 103 S.Ct. at 1668–69; see also *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2138, 119 L.Ed.2d 351 (1992) (rejecting standing for want of sufficiently "imminent" future injury). Even now, in fact, the plaintiffs do not suggest that there is any *likelihood* that the two testers will re-initiate contact with BMC; they refer only to the "possibility" of this event. That

possibility seems remote indeed. Their usefulness as testers is minimal because they are now known to BMC, and indeed it does not appear from the materials before us that they are still employed as testers at all. Their adversarial relationship with BMC, moreover, as well as their established record as deceivers, make it highly implausible that they would ever return as *bona fide* job seekers. Cf. *United Transp. Union v. ICC,* 891 F.2d 908, 913 n. 8 (D.C.Cir.1989) (court may discredit incredible allegations).

The district court overlooked these problems on the theory that the plaintiffs themselves control whether they re-initiate contact with BMC. Mem.Op. at 7. But this fact does not excuse the plaintiffs from alleging that they plan to do so. To the contrary, the Supreme Court has categorically rejected the proposition that a plaintiff seeking prospective relief need assert a threat of imminent future injury "only when the alleged harm depends upon 'the affirmative actions of third parties beyond a plaintiff's control'". See *Defenders of Wildlife,* — U.S. at — n. 2, 112 S.Ct. at 2139 n. 2.

In any event, the plaintiffs simply do not control whether they will suffer any future injury, for they do not control whether BMC would discriminate against them in any future encounter. Suppose we *could* assume that the tester plaintiffs are likely to return to BMC in the reasonably near future. Indeed, for the sake of their § 1981 claim (and possibly even their Title VII claim, see *supra* at 6 n. 1), suppose we could assume that they will do so as *bona fide* candidates for employment rather than as testers. They would still appear to be in much the same position as the plaintiff in *Lyons:* while he presumably could have initiated another encounter with the Los Angeles police, he could not control whether he would be subjected to a second illegal chokehold.

In *Lyons,* the Supreme Court stated that unless the plaintiff could allege that Los Angeles ordered or authorized its police officers to apply unprovoked chokeholds, he could "establish an actual controversy in this case" only by "mak[ing] the incredible assertion ... that *all* police officers in Los Angeles *always* choke any citizen with whom they

happen to have an encounter". *Lyons,* 461 U.S. at 105–06, 103 S.Ct. at 1667. This formulation may be hyperbolic; indeed, *Lyons* itself said that the plaintiff's standing to seek an injunction "depended on whether he was *likely* to suffer future injury from the use of the chokeholds by police officers". *Id.* at 105, 103 S.Ct. at 1667 (emphasis added); see also *International Union of Bricklayers & Allied Craftsmen v. Meese,* 761 F.2d 798, 803 (D.C.Cir.1985) (adopting "fairly probable" as standard). But see *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 1724–25, 109 L.Ed.2d 135 (1990) (indicating that plaintiff whose standing rests on threat of future injury must show that this injury is "certainly impending"); *Defenders of Wildlife,* — U.S. at — n. 2, 112 S.Ct. at 2139 n. 2 (same); *Animal Legal Defense Fund v. Espy,* 23 F.3d 496, 500–01 (D.C.Cir.1994), (same). Whatever the exact standard for judging the likelihood of future injury, however, the tester plaintiffs here have said nothing to indicate that future violation of their rights is even remotely probable. Indeed, besides its oblique statement that BMC's treatment of the testers reflects "a pattern, practice and policy of employment discrimination on the basis of race", the complaint does not even *address* the likelihood that BMC may discriminate against the individual plaintiffs in the future.

For all these reasons, the facts as alleged in the complaint do not come close to indicating that either tester "will again be subjected to the alleged illegality". See *Lyons,* 461 U.S. at 109, 103 S.Ct. at 1669. The tester plaintiffs therefore lack standing to seek prospective relief.

## B. *The Possibility of Amendment*

As a fallback position, the plaintiffs claim that "the appropriate course is to remand to the District Court to permit plaintiffs an opportunity to amend and supplement their Complaint". Appellees' Brief at 37 n. 26. In *Havens,* which involved a challenge to a realty company's alleged practice of steering white customers to white areas and black customers to black areas, the Supreme Court followed this course with respect to two plaintiffs who alleged that the company's ac-

tions had deprived them of the benefits of living in an integrated community. Though the complaint simply stated that these plaintiffs were "residents of the City of Richmond or Henrico County", the Court said they would have standing only if they lived in neighborhoods where the company's actions had "an appreciable effect". See *Havens,* 455 U.S. at 376–77, 102 S.Ct. at 1122–24. Because the complaint was not sufficiently specific about where they lived, it was "impossible to say" whether its factual allegations, if proved, would demonstrate the requisite injury. *Id.* at 378, 102 S.Ct. at 1124. Citing Rule 12(e) of the Federal Rules of Civil Procedure, the Court therefore remanded with instructions for the district court to give the plaintiffs "an opportunity to make more definite the allegations of the complaint". *Id.*

The Court's later decisions clarify the reasoning behind this disposition. *Havens* came to the Court on the defendant's motion to dismiss the case on the pleadings, pursuant to Rule 12(b). Though courts addressing such motions usually must "presume[ ] that general allegations embrace those specific facts that are necessary to support the claim", *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990), *Havens* establishes that such a presumption is unwarranted when the allegations are *too* general. Even then, however, the *contrary* presumption may be inappropriate; faced with such allegations, courts ruling on a Rule 12(b) motion often should not assume that the claim is invalid without giving the plaintiff an opportunity to make more specific claims.[2]

The case before us is quite different. We do not confront a complaint whose allegations are so general that we cannot tell whether, if proved, they would demonstrate injury in fact. To the contrary, the allegations plainly are *not* sufficient to support standing, for they simply do not deal with the likelihood of any future injury to the plaintiff

testers. What is necessary, then, is not the "more definite statement" contemplated by Rule 12(e), but an amendment adding allegations that the present complaint does not even touch upon. Rule 15(a) makes clear that the plaintiffs have no automatic right to add those allegations.

On the other hand, district courts do have the *discretion* to permit such amendments when considering a motion to dismiss for want of standing. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975); see also, e.g., *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 113 n. 25, 99 S.Ct. 1601, 1614 n. 25, 60 L.Ed.2d 66 (1979); *Sierra Club v. Morton,* 405 U.S. 727, 736 n. 8, 92 S.Ct. 1361, 1367 n. 8, 31 L.Ed.2d 636 (1972); *Newark Branch, NAACP v. Town of Harrison,* 907 F.2d 1408, 1416–17 (3d Cir.1990). Here, the district court did not consider whether to exercise this discretion, because it erroneously believed that no amendment was necessary. Accordingly, while we vacate the district court's denial of BMC's motion to dismiss the individual testers' suit, we do not order it to grant that motion; instead, we remand the case for the district court to exercise its sound discretion over whether to permit amendment. We see no reason why plaintiffs who win in the district court should automatically be in a *worse* position than plaintiffs whose allegations of standing have been rightly found defective by the district court.

Of course, a plaintiff's successful effort to persuade a trial court to take an erroneous view of the law may yield different equities from those prevailing in the absence of such an effort. In some circumstances, it might well be an abuse of discretion for the district court to permit plaintiffs to add new allegations to a complaint after their adversaries have been forced to spend substantial time and effort litigating the adequacy of the old allegations. Cf. *National Wildlife Federation,* 497 U.S. at 897, 110 S.Ct. at 3193 ("[A]

---

2. The rules become less forgiving as litigation moves along. When a court confronts a Rule 56 motion for summary judgment, "[i]t will not do to 'presume' the missing facts". *National Wildlife Federation,* 497 U.S. at 889, 110 S.Ct. at 3189. By the same token, after the district court

has held its summary-judgment hearing, plaintiffs certainly cannot assume that the court will permit them to supply any requisite averments through supplemental affidavits. See *id.* at 894–98, 110 S.Ct. at 3191–94.

litigant's failure to buttress its position because of confidence in the strength of that position is always indulged at the litigant's own risk."). But in any event, the matter of amendment is in the first instance for the district court.

## C. Pendent Claims under District of Columbia Law

The tester plaintiffs have also asserted a cause of action under the District of Columbia's Human Rights Act. That statute contains a provision similar to § 2000e–2(b), see D.C.Code § 1–2512(a)(2), and it goes further than the original Title VII by authorizing suits for damages as well as for equitable relief, see *id.* § 1–2556. But the testers were able to bring their claim under this statute to federal court only because it was pendent to their federal claims. See 28 U.S.C. § 1367(a). As a result, even if the plaintiffs have a cause of action for damages under D.C. law, it will be within the district court's discretion whether or not to dismiss this claim if it dismisses both their federal claims. See *id.* § 1367(c)(3); cf. *Clifton Terrace Assocs. v. United Technologies Corp.,* 929 F.2d 714, 723 (D.C.Cir.1991).

## II. The Fair Employment Council

The other plaintiff in this action, the Fair Employment Council of Greater Washington, fares better under our analysis. The Council does not claim standing on behalf of any members; in fact, it is not a membership organization. Cf. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). It claims instead that BMC's allegedly discriminatory actions have caused it injury in its own right.

We agree that the Council has alleged "injury in fact" sufficient to satisfy the requirements of Article III. And, though the Council is suing BMC over alleged violations of statutory rights enjoyed by third parties, we conclude that Congress did give the Council a cause of action under Title VII. We also conclude, however, that the Council has no cause of action under § 1981.

## A. Article III Standing

■ Like the fair-housing organization that was one of the plaintiffs in *Havens,* the Council has a broad goal of promoting equal opportunity independent of merely seeking more enforcement of the civil rights laws. Second Amended Complaint ¶ 5. Its testing program is but one means toward this goal; the Council also conducts "community outreach and public education, counseling, and research projects". Declaration of Charles W. Jackson ¶ 8 (Sept. 18, 1992). The complaint alleges that BMC's discriminatory actions have interfered with these efforts and programs and have also required the Council to expend resources to counteract BMC's alleged discrimination. Second Amended Complaint ¶¶ 45, 58, 60.

These allegations closely track the claims that the Supreme Court found sufficient in *Havens.* See *Havens,* 455 U.S. at 379, 102 S.Ct. at 1124–25. Fairly read, they indicate that BMC's alleged pattern of discrimination—evidenced by the alleged treatment of the testers—has made the Council's overall task more difficult. Discrimination by BMC, for instance, might increase the number of people in need of counseling; similarly, to the extent that BMC's actions have made it harder for minorities to find jobs in greater Washington, they may have reduced the effectiveness of any given level of outreach efforts. If discriminatory actions taken by BMC have "perceptibly impaired" the Council's programs, "there can be no question that the organization has suffered injury in fact". *Id.*

In reaching this conclusion, however, we explicitly reject the Council's suggestion that the mere expense of testing BMC constitutes "injury in fact" fairly traceable to BMC's conduct. The diversion of resources to testing might well harm the Council's other programs, for money spent on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results not from any actions taken by BMC, but rather from the Council's own budgetary choices. Indeed, it is not really a harm at all; assuming that BMC's actions did not have any *other* effect on the Council's programs independent of its efforts to increase legal pres-

sure on possible open housing violators, the Council and its programs would have been totally unaffected if it had simply refrained from making the re-allocation. One can hardly say that BMC has injured the Council merely because the Council has decided that its money would be better spent by testing BMC than by counseling or researching.[3]

We disagree with the Seventh Circuit that *Havens* would support such a purely self-referential injury. In *Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir.1990), the court concluded that even when a fair-housing organization's other activities had *not* been impaired by the defendant's discriminatory practices, "the only injury which need be shown ... is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Id.* at 1526. By this logic, the time and money that plaintiffs spend in bringing suit against a defendant would itself constitute a sufficient "injury in fact", a circular position that would effectively abolish the requirement altogether. Indeed, an organization devoted exclusively to advancing more rigorous enforcement of selected laws could secure standing simply by showing that one alleged illegality had "deflected" it from pursuit of another, contrary to such decisions as *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). *Havens* did not so hold. The Court there did not base standing on the diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the organization's programs. To be sure, the Court did mention the "drain on the organization's resources". Yet this drain apparently sprang from the organization's need to "counteract" the defendants' assertedly illegal practices, and thus was simply another manifestation of the injury that those practices had inflicted upon "the organization's noneconomic interest in encourag-ing open housing", an interest that is quite intelligible apart from the allied efforts at increasing legal pressure on civil-rights violators. See *Havens,* 455 U.S. at 379 & n. 20, 102 S.Ct. at 1124 & n. 20; cf. *Spann v. Colonial Village,* 899 F.2d 24, 27–29 (D.C.Cir.1990) (finding standing because in order to offset defendant's allegedly discriminatory advertisements, plaintiff organization had to spend more on its educational and counseling efforts).

A corollary of our conclusion is that the Council's standing stems from BMC's actions against *bona fide* employment candidates, not from BMC's actions against the testers. The Council has adequately alleged that BMC has a pattern or practice of discrimination, and its treatment of the testers may be some evidence of such a pattern. Any harm to the Council's programs, however, flows from BMC's refusal to refer genuine job-seekers for employment. As this case proceeds, the Council will have to provide support for its claim that BMC's alleged discrimination has "perceptibly impaired" its programs.

## B. Cause of Action

■ Though the Council has adequately alleged an "injury in fact" sufficient to meet the requirements of Article III, this does not necessarily mean that Congress has conferred a cause of action upon it. BMC has done nothing to impair the Council's *own* right to make contracts, nor is the Council even capable of seeking an employment referral. Instead, the Council's asserted injuries flow from BMC's alleged *violations of other people*'s rights under § 1981 and Title VII. This fact triggers concerns about an aspect of the "prudential" limits on standing: ordinarily, a plaintiff "must assert his own legal interests, rather than those of third parties". *Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at 1608.

---

**3.** For the same reason, we reject the district court's theory that the money that the Council spent on the *second* test (if not the money that it spent on the first one) gave it "a constitutionally cognizable injury" because BMC's alleged discrimination against the first set of testers "could have been a factor" in the Council's decision to run the second test. Mem.Op. at 10–11. BMC's treatment of the first set of testers did not impair any of the Council's programs in any way, even though the pattern of discrimination evidenced by such tests may have done so. The Council simply decided that its limited resources would be better spent on testing BMC again than on testing a different agency or on pursuing its other programs.

To phrase the principle this way, however, is to beg the question. If Congress has given the Council a cause of action to redress the injuries that it is suffering as a result of BMC's alleged discrimination against candidates for referrals, then the Council is indeed suing to protect its own "legal interests". Cf., e.g., *Smith v. City of Cleveland Heights,* 760 F.2d 720, 724 (6th Cir.1985). A more precise statement of the principle, then, is that a statute ordinarily will not be interpreted to confer causes of action upon people whose only injuries derive from the violation of others' rights under the statute.

When the "prudential" limits on standing to raise statutory claims are understood in this way—as a set of presumptions that courts use in determining whether the statutes in question confer a cause of action upon the plaintiff, see, e.g., *Warth v. Seldin,* 422 U.S. 490, 500–01, 95 S.Ct. 2197, 2205–07, 45 L.Ed.2d 343 (1975); *Hazardous Waste Treatment Council v. United States Environmental Protection Agency,* 861 F.2d 277, 283 (D.C.Cir.1988)—the "prudential" label seems a misnomer. These "prudential" rules are simply canons of statutory interpretation, and Congress is free to override the normal presumptions. In *Havens,* for instance, the Supreme Court noted that Congress intended standing to sue under § 812 of the Fair Housing Act to extend to the full reach permitted by the Constitution, and concluded that "the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section". *Havens,* 455 U.S. at 372, 102 S.Ct. at 1120; accord *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206–07. Statutes of this sort confer a cause of action upon everyone who meets the Article III requirements—that is, anyone "genuinely injured by conduct that violates *someone's ...* rights" under the statute. *Gladstone, Realtors,* 441 U.S. at 103 n. 9, 99 S.Ct. at 1609 n. 9.

 Our case law establishes that Title VII is such a statute. Congress specifically permitted any "person claiming to be aggrieved" by an unlawful employment practice to file suit (after exhausting certain other potential avenues of relief). See 42 U.S.C. § 2000e–5(f)(1). This language, we have

held, opens the courts to "anyone who satisfies the constitutional requirements". *Gray v. Greyhound Lines,* 545 F.2d 169, 176 (D.C.Cir.1976); see also *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972) (citing with approval the Third Circuit's decision to the same effect). Accordingly, if the Council can back up its allegations of Article III standing with actual proof, it has a cause of action under Title VII.

Section 1981 is a different matter. A footnote in *Gray* indicated that there too standing extended to the full extent permissible under Article III. *Gray,* 545 F.2d at 176 n. 18. This conclusion, however, rested on an unsustainable assumption that the Supreme Court, in citing a snippet of Title VII's legislative history to the effect that the remedies available under Title VII were "co-extensive" with an individual's right to sue under § 1981, meant that Congress had identically resolved prudential standing issues under the two statutes. See *Johnson v. Railway Express Agency,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). In fact, as the Supreme Court made clear, the committee's statement that Title VII and § 1981 were "co-extensive" simply meant that the two statutes *co-existed,* with the result that Title VII did not pre-empt whatever rights an individual might enjoy under § 1981. *Id.*

Moreover, *Gray*'s view of § 1981 flatly conflicts with the Supreme Court's holding in *Warth v. Seldin.* There, an organization whose members included residents of the town of Penfield, New York, complained that the town's zoning ordinance excluded people of low and moderate income in violation of those people's rights under § 1981. This exclusion, in turn, injured the organization's members by depriving them of the benefits of living in an integrated community. Such an injury satisfies the constitutional requirements, and the Court accordingly has recognized it as a basis for standing in suits under the Fair Housing Act (which confers standing to the full extent permitted by Article III). See *Trafficante,* 409 U.S. at 208–10, 93 S.Ct. at 366–67. In *Warth,* however, the Court held that § 1981 was critically differ-

ent from the Fair Housing Act in this respect. Invoking the "prudential" rule against allowing litigants "to raise putative rights of third parties", it accordingly barred the organization's suit. *Warth,* 422 U.S. at 512–14, 93 S.Ct. at 2212–13.

As one would expect, then, other circuits—including our own—have rejected *Gray* 's view of § 1981. In *Mackey v. Nationwide Insurance Companies,* 724 F.2d 419 (4th Cir. 1984), an insurance agent attempted to challenge his former employer's alleged practice of refusing to underwrite risks in predominantly black neighborhoods. The agent claimed that this practice had forced him to forgo the money that he could have earned by selling policies in these areas. But while Congress *could* constitutionally have conferred a cause of action upon the agent to redress this "injury in fact", the court held that § 1981 did not do so. Distinguishing § 1981 from the Fair Housing Act, the court decided that standing under § 1981 is restricted to "the direct victims of the alleged discriminatory practice", at least as long as there is no impediment to suits by those victims. *Id.* at 422.

 We too have now explicitly embraced *Mackey* rather than *Gray.* In *Clifton Terrace Associates v. United Technologies Corp.,* 929 F.2d 714 (D.C.Cir.1991), the owner of a low-income housing complex sued the Otis Elevator Company and its corporate parent for refusing to negotiate a service contract for the elevators in the complex, allegedly because the residents of the complex were overwhelmingly black. The owner plainly had suffered "injury in fact" as a result of this refusal, for its elevators were deteriorating; indeed, the city government had taken action against it for violating its duties as a landlord. Accordingly, we dealt with the owner's Fair Housing Act claims on the merits. But we accorded a different treatment to the owner's claims under § 1981. Concluding that "the direct victims of the alleged discrimination are the residents of Clifton Terrace" rather than the owner, we invoked *Mackey* to hold that the owner could not sue under § 1981. *Id.* at 721.[4] Accordingly, our law is now in accord with that of the Supreme Court and other circuits in concluding that § 1981 does not confer a cause of action on persons whose injuries derive only from the violation of others' rights.

In arguing that the "prudential" barriers to standing nonetheless do not preclude its particular suit, the Council cites *Des Vergnes v. Seekonk Water District,* 601 F.2d 9 (1st Cir.1979). Yet that case does not get it very far. *Des Vergnes* held simply that § 1981 confers an implied right of action "against any other person who, with a racially discriminatory intent, interferes with [the plaintiff's] right to make contracts with nonwhites"; by the same token, the statute confers an implied right of action "against any other person who, with a racially discriminatory intent, injures [the plaintiff] because he made contracts with nonwhites". *Id.* at 14; see also *Winston v. Lear–Siegler, Inc.,* 558 F.2d 1266, 1270 (6th Cir.1977); *DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306, 312, modified, 520 F.2d 409 (2d Cir.1975); cf. *Sullivan v. Little Hunting Park,* 396 U.S. 229, 237, 90 S.Ct. 400, 404–05, 24 L.Ed.2d 386 (1969) (reaching parallel result under § 1982). Im-

---

**4.** This conclusion, although not our embrace of *Mackey,* seems to be in tension with *Gersman v. Group Health Association,* 931 F.2d 1565 (D.C.Cir.1991), vacated on other grounds, —— U.S. ——, 112 S.Ct. 960, 117 L.Ed.2d 127 (1992), reinstated, 975 F.2d 886, 900 (D.C.Cir.1992). That case also involved a claim that the defendant had refused to contract with one person ("A") because of a discriminatory animus against someone else ("B"). But where *Clifton Terrace* held that A lacked standing to sue under § 1981 because any such suit would be an attempt to assert B's rights under the statute, *Gersman* took the opposite view. Reasoning that § 1981 protects the right to make contracts, we held that B lacked standing because it was A—not B—with whom the defendant allegedly was

refusing to contract. See *id.* at 1567, 1569. Cf., e.g., *Alizadeh v. Safeway Stores, Inc.,* 802 F.2d 111, 114 (5th Cir.1986) (recognizing cause of action under § 1981 where employer allegedly fired plaintiff because her husband was not white); *Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888, 890 (11th Cir.1986) (similar, where company allegedly refused to hire plaintiff because of his wife's race); *Fiedler v. Marumsco Christian School,* 631 F.2d 1144, 1149 (4th Cir. 1980) (recognizing cause of action under § 1981 where white students alleged that private school had expelled them for associating with blacks); see also *Patrick v. Miller,* 953 F.2d 1240, 1250 (10th Cir.1992) (holding that such causes of action under § 1981 are "clearly established").

plicit in § 1981, these cases declare, is a cause of action protecting people from private retaliation for refusing to violate other people's rights under § 1981, or for exercising their own § 1981 rights. The present case simply does not implicate this principle.

The normal presumption against reading a statute to authorize "derivative" causes of action—that is, causes of action to redress injuries that derive entirely from the violation of someone else's rights under the statute—is subject to only one exception that is even arguably relevant here. Courts sometimes infer that the legislature intended to authorize such causes of action when, in their absence, no one would be able to assert the statutory rights that the legislature created. Because of this inference, a litigant might have a cause of action even though his injuries flow from the violation of other people's statutory rights, at least if both of the following conditions are met: (1) the litigant's interests are aligned with the other people's interests, and (2) the other people are unable to bring suit in their own right. See, e.g., *Canfield Aviation v. National Transp. Safety Bd.*, 854 F.2d 745, 748 (5th Cir.1988); *Flittie v. Solem*, 827 F.2d 276, 280 (8th Cir. 1987); *In re Merrill Lynch Relocation Management, Inc.*, 812 F.2d 1116, 1121 (9th Cir. 1987).

■■ But even assuming that the Council's interests are aligned with those of the direct victims of BMC's alleged discrimination, the obstacles to suit by those victims are not serious enough to warrant the inference that § 1981 confers a cause of action upon the Council. To be sure, the people to whom BMC denies employment referrals may not necessarily know why their applications were unsuccessful, and so the possible victims of BMC's alleged discrimination may not always know who they are. But the Council itself could remedy much of the problem simply by publicizing the results of

its tests and offering litigation assistance to people who suspect (on the basis of this new information) that BMC has discriminated against them. In the present case, as in *Warth v. Seldin*, "there is no indication that [direct victims of discrimination by BMC] are disabled from asserting their own right in a proper case." *Warth*, 422 U.S. at 510, 95 S.Ct. at 2211. Certainly they do not face anything like the practical obstacles confronting people excluded from a jury for discriminatory reasons, whose rights the Court has allowed a criminal defendant to assert. See *Powers v. Ohio*, 499 U.S. 400, 414–15, 111 S.Ct. 1364, 1372–73, 113 L.Ed.2d 411 (1991) (describing the "daunting" barriers to suit by an excluded juror); cf. *Scott v. Greenville County*, 716 F.2d 1409, 1416 (4th Cir.1983) (hypothesizing preemptive discrimination that could never be identified with any individual victims).

The Third Circuit has perceived "seemingly inconsistent strains" in the Supreme Court's treatment of whether "the 'obstacle' factor" is an essential prerequisite to third-party standing, *Amato v. Wilentz*, 952 F.2d 742, 749 (3d Cir.1991), and has resorted to a "more flexible balancing approach" in an effort to make sense of the Court's jurisprudence. *Id.* at 749–50 & n. 8. But we think the cases can in fact be reconciled.

Apart from cases involving "the 'obstacle' factor", the Court generally has allowed a litigant to assert the rights of a third party "only when the third party's rights protect that party's relationship with the litigant". *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 809 (D.C.Cir.1987).[5] In the lion's share of these cases, the litigant seeks to challenge direct restrictions on its *own* activities on the ground that enforcement of the restrictions against it would dilute or abrogate the rights of third parties. As the Court has summed up its jurisprudence, "When ... enforcement of a restriction against the litigant prevents a

5. The one notable exception to this rule is inspired by First Amendment overbreadth analysis. In *Secretary of State of Maryland v. Joseph H. Munson Co.;* 467 U.S. 947, 956–57, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984), for example, the Court allowed a professional fundraiser to assert its clients' First Amendment rights in challenging statutory limits on the amount that charitable organizations can pay fundraisers. But the Court specifically noted that "outside the

First Amendment context", the fundraiser's standing would have been in doubt because it had not shown that "practical obstacles prevent [the charities] from asserting rights" on their own behalf. *Id.* Even within the First Amendment realm, third-party standing is by no means automatic. See, e.g., *Renne v. Geary*, 501 U.S. 312, 320, 111 S.Ct. 2331, 2338, 115 L.Ed.2d 288 (1991).

third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist." *United States Dep't of Labor v. Triplett,* 494 U.S. 715, 720, 110 S.Ct. 1428, 1431, 108 L.Ed.2d 701 (1990); see also *Warth,* 422 U.S. at 510, 95 S.Ct. at 2211. For example, the Court has allowed beer vendors to assert the equal-protection rights of their potential customers in challenging a prohibition on the sale of beer to young males, *Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976); distributors of contraceptive devices to assert the privacy rights of contraceptive purchasers in challenging restrictions on the distributors, *Carey v. Population Servs. International,* 431 U.S. 678, 682–84, 97 S.Ct. 2010, 2014–16, 52 L.Ed.2d 675 (1977); and booksellers to assert the First Amendment rights of bookbuyers in challenging the prohibition of certain commercial displays, *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 642–43, 98 L.Ed.2d 782 (1988). Less frequently, the Court has allowed litigants to assert third parties' rights in challenging restrictions that do *not* operate directly on the litigants themselves, but that nonetheless allegedly disrupt a special relationship—protected by the rights in question—between the litigants and the third parties. See, e.g., *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (allowing military academy and parochial school to assert constitutional rights of students and parents in challenging state law requiring parents to send their children to government school); see also *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623–24 n. 3, 109 S.Ct. 2646, 2651–52 n. 3, 105 L.Ed.2d 528 (1989) (allowing lawyers to challenge federal forfeiture laws that allegedly violate their clients' Sixth Amendment right to counsel); *Singleton v. Wulff,* 428 U.S. 106, 113–18 & n. 7, 96 S.Ct. 2868, 2873–76 & n. 7, 49 L.Ed.2d 826 (1976) (plurality opinion) (allowing abortion-performing doctors to complain that restrictions on Medicaid payments for abortion violate the constitutional rights of women seeking abortions). See generally *National Cottonseed Products Ass'n v. Brock,* 825 F.2d 482, 489–92 & n. 15 (D.C.Cir.1987).

Whatever the precise limits of these cases, they offer no help to the Council. The Council certainly faces no direct restriction on its own activities, and the § 1981 rights of people who seek referrals from BMC are unrelated to any special relationship between those people and the Council. Under *Warth v. Seldin,* the Council therefore cannot bring suit to complain about the violation of those people's § 1981 rights. See *Warth,* 422 U.S. at 514 n. 22, 95 S.Ct. at 2213 n. 22.

\* \* \* \* \* \*

To sum up, the Council lacks a cause of action under § 1981. It can proceed with its Title VII claim, but it has a cause of action only to the extent that the effects of BMC's discrimination have perceptibly impaired its programs. As for the individual testers, they have not stated a cause of action under § 1981, nor have they established standing to seek the only form of·relief that might be available to them under Title VII.

We remand the case to the district court for proceedings consistent with this opinion.

*So ordered.*