Taye ADDISU; Mokhtar Al–Saeed; Ghassan Abu Hemdeh, Plaintiffs–Appellants,

v.

FRED MEYER, INC., a Delaware Corporation, Defendant–Appellee.

No. 98–35854.

United States Court of Appeals, Ninth Circuit.

Argued Sept. 15, 1999

Filed Jan. 4, 2000

Leonard R. Berman, Beaverton, Oregon, for the plaintiffs-appellants.

Marjorie A. Spiers and Janet M. Schroer, Hossfam, Hart & Wagner, Portland, Oregon for the defendant-appellee.

Before: ALDISERT,* KLEINFELD and FLETCHER, Circuit Judges.

ALDISERT, Circuit Judge:

This appeal by would-be purchasers of the familiar blue jeans name brand Levi's, at Fred Meyer, Inc., a prominent nationwide retailer, presents the question of whether a person can sue under 42 U.S.C. § 1981 for the refusal of a retailer to enter into a sales contract, which was solicited through fraudulent misrepresentation by the potential customer and would be voidable at that retailer's discretion.

Appellants Taye Addisu, Mokhtar Al–Saeed and Ghassan Abu Hemdeh brought a complaint against Fred Meyer alleging that it refused to sell them Levi's jeans because of their race or color. They contend that they were allowed to purchase any other item in the store, but were precluded from purchasing the jeans. Addisu is an American citizen of Ethiopian descent, Al–Saeed is a legal resident alien from Yemen and Hemdeh is an American citizen of Jordanian descent.

Fred Meyer admits that it refused to sell to the Appellants, but argues that the basis for its refusal was not their race or color but a race-neutral policy of the jeans' manufacturer, Levi Strauss and Co. ("LS & CO."), that limits sales of its products only to ultimate consumers and prohibits

* Ruggero J. Aldisert, Senior Circuit Judge for the Third Circuit, sitting by designation.

retailers like Fred Meyer from selling Levi's to re-sellers or dealers. Fred Meyer argues, and Appellants agree, that they are not ultimate consumers purchasing for personal use.

Appellants concede that they are dealers or agents of dealers who intend to resell the jeans, precisely the category of buyer prohibited under the Levi's policy implemented by Fred Meyer. Appellants' attempts to purchase come within what the stated Levi Strauss policy describes as participating in "Retail Accumulation [which] occurs when individuals or groups who are not the ultimate consumers purchase significant quantities of LS & CO.

products from LS & CO.'s approved retail customers." [1] Fred Meyer is an approved Levi Strauss retail customer. Appellants were well aware of the Levi's policy at the times of all their attempted purchases.

Appellants sued Fred Meyer for discrimination pursuant to 42 U.S.C. § 1981,[2] averring that the conduct of the store "was wanton and intentional, was intended to deprive the plaintiff of his federally protected civil and legal rights, based on his race and/or color." Fourth Amended Complaint ¶ 7, E.R. Supp. Tab 36, at 3. They also allege a conspiracy to discriminate based on race pursuant to 42 U.S.C. § 1985(3).[3] Appellants sought an injunc-

1. The Levi Strauss policy, as communicated to retailers, reads:

> Levi Strauss & Co.'s distribution policy is to sell our products to retailers who sell them to the ultimate consumer in approved retail locations within company guidelines.
> Retail Accumulation occurs when individuals or groups who are not the ultimate consumer purchase significant quantities of LS & CO. products from LS & CO.'s approved retail customers.
> To minimize Retail Accumulation, LS & CO. requires its retailers to limit sales to consumers to six units of Levi's jeans and six units of Dockers pants. While we do require retailers to enforce this six-unit limit policy, they may decide for their own business reasons and their customers' benefit to set a lower limit.
> This policy was put in place for the benefit of the consumer and the retailer. If individuals or groups are allowed to buy large quantities during store visit(s), there may be insufficient sizes for other shoppers. This policy helps to ensure the reliability of product availability for all shoppers, which may generate repeat visits and boost your business with loyal consumers.
> Accumulators often work in pairs or groups and make a point of coming in through different entrances and using different registers. They purchase quantities-often all in the same size range-and frequently pay with cash or store gift certificates. If you're repeatedly selling the six-pair limit, you're probably selling to accumulators, which violates LS & CO.'s distribution policy.
> Here are some suggestions for preventing accumulation:
> Post six-unit limit and Levi Strauss & Co. policy signs. These are available from your Sales Rep or Telerep.

> If possible, use only one register to ring up LS & CO. Products.
> Ensure that all sales people are well-briefed on the policy and its importance. Make sure they know that if they have suspicions about repeat purchasers, they should contact a department manager, store manager or store security.
> If consumers question the policy, please refer to the following points:
> It is LS & CO.'s policy to sell to retailers who in turn sell to consumers that use the product for personal consumption.
> This policy was put in place so that product is on hand in the colors and sizes that consumers are looking for.
> This policy is a condition of doing business with LS & CO., and we risk losing LS & CO. as a vendor if we do not comply with their policy.
> E.R. Supp. at Tab 43–A.

2. 42 U.S.C. § 1981 provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens, and shall be subject to punishment, pains, penalties, taxes, license, and exactions of every kind, and to no other.

3. 42 U.S.C. § 1985(3) provides in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

tion as well as compensatory and punitive damages. The district court granted Appellee's motion for summary judgment on all of Appellants' claims. The court employed the disparate treatment test according to standards used to analyze disparate treatment claims under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e; *Williams v. Edward Apffels Coffee Co.*, 792 F.2d 1482, 1484 (9th Cir.1986). It determined that although Appellants established a prima facie case, the store came forward with a nondiscriminatory explanation and that Appellants did not prove that this reason was pretextual. The court also determined that Appellants failed in their § 1985(3) claims because they did not prove discriminatory intent. The court reasoned:

> An indispensable element of a claim under 42 U.S.C. § 1985(3) is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action, *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) . . . ." There was no such evidence in this case. Fred Meyer has proffered evidence showing that its refusal to sell Levi's to the plaintiffs was motivated by a reasonable belief that plaintiffs were agents for dealers attempting to purchase the Levi's for resale.

Dist. Ct. Op. at 11, E.R. Tab 56, at 11.

On appeal Appellants argue that there is a genuine issue of material fact to preclude summary judgment under §§ 1981 and 1985(3). Summary judgment should be granted if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989). The underlying substantive law governing the claims determines whether or not it is material. *Price v. Taco Bell Corporation,* 934 F.Supp. 1193, 1196 (D.Or.1996). Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party. *Id.* There must be enough doubt for a "reasonable trier of fact" to find for plaintiffs in order to defeat the summary judgment motion. *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994).

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. The appeals were timely filed under Rule 4, Federal Rules of Appellate Procedure.

I.

Fred Meyer is required to conform to Levi Strauss policy as a condition of selling Levi's Jeans. As a retailer of Levi's, it limits the number of Levi Strauss products it sells to individual consumers (generally two pairs to a customer) and refuses to sell to persons who are acquiring, or are suspected to be acquiring, Levi's for resale. Such persons are referred to variously as retail accumulators, dealers and diverters. Fred Meyer's company policy allows employees to refuse to sell Levi's to an individual if the employee knows or reasonably believes that the individual is a dealer or the agent of a dealer. As a retailer, it enforces this practice because Levi Strauss requests it to notify customers that it has been advised by Levi Strauss that "[t]his policy is a condition of doing business with LS & Co., and we risk losing LS & Co. as a vendor if we do not comply with their policy." *See* note 1.

Fred Meyer has certain criteria which form the basis for suspecting that a pur-

chaser is a dealer or the agent of a dealer rather than an ultimate consumer.[4] Sales personnel are alerted to the following circumstances: the purchasers are in groups; they seek to purchase Levi's only, and no other merchandise; they show little or no concern about size; they have previously been observed buying multiple pairs of Levi's; they purchase only by cash· or gift certificate. E.R. Supp. Tab 43B. The Levi Strauss policy provides that "[w]hile we do require retailers to enforce the six-unit limit policy, they may decide for their own business reasons and their customer's benefit to set a lower limit." *See* note 1. Thus, Fred Meyer's lower limit of two pairs per customer is within the Levi's policy.

On October 1, 1996, Appellant Addisu went to four Fred Meyer stores at the request of a dealer to purchase Levi's on the dealer's behalf. In each store, he purchased two pairs of Levi's without hindrance. No reference was made to his race or national origin. That same day, he and his dealer, Abbas Al–Sheikly, went to a fifth store, the Glisan Fred Meyer, also to purchase Levi's on Al–Sheikly's behalf. E.R. Tab VI.B, at 83–87; E.R. Supp. Tab 43D, at 1. An employee, Shelley Phelps, suspected Addisu was acting as or on behalf of a dealer and requested assistance from another employee, Faith Kreis. Ms.

Kreis refused to sell the Levi's to Addisu and told him she suspected that he was a dealer. She told him he could buy anything else he wanted at the store, except for the jeans. E.R. Tab VI.B, at 84. In his deposition, Addisu testified that he had shopped at Fred Meyer on other occasions and had not been treated in a discriminatory manner. E.R. Supp. Tab 43D, at 1.

On October 31, 1996, Addisu returned to the Glisan Fred Meyer store at the direction of his attorney and accompanied by a private investigator. E.R. Supp. Tab 43, at 4; Tab 52, at 2. He requested a pair of Levi's, and a Fred Meyer employee, Shirley Johnson, gave them to him. Mr. Addisu then told Ms. Johnson that he had previously been refused the right to purchase Levi's and asked her questions about the store's policy and whether it related to his nationality. The investigator has testified that Mr. Addisu's conversation with Ms. Johnson was for the purpose of developing his lawsuit. E.R. Tab VI.B, at 74.

Mr. Addisu then asked to speak with Shelley Phelps, the employee who had refused to sell to him on October 1, 1996. Ms. Phelps, still believing Mr. Addisu to be an agent for a dealer, took back the Levi's Mr. Addisu had been given and refused to sell them to him. E.R. Tab VI.B, at 93–94.

**4.** Fred Meyer described its policy in an internal memorandum.

  Under no circumstances are any pairs of Levi's jeans to be sold to any known dealers, wholesalers, other retailers and or agents representing them. Levi's Shrink to Fit and Levi's Pre–Washed 501 product will always carry a limit of 2 pair per customer whether at regular or sale prices for our legitimate customers.

  Any sales person encountering known diverters or their agents should immediately contact their person in charge. That management person should then proceed to explain to the individual(s) that we will not sell this product to them.

  . . . .

  The Fred Meyer legal department has given us clear indication that we can refuse to sell product [sic.] to an individual or group of individuals that we either know or reasonably suspect to be "retail diverters".

  For example, it would be reasonable to suspect that four individuals entering our store together, each seeking to purchase two pair of Levi's jeans, any size, and no other product, would comprise a group acting on behalf of a diverter. It would be appropriate to refuse to sell product to each member of the group.

  . . . .

  Possible diverter if:
  in a group
  only buying Levi's
  no concern over size purchasing.

E.R. Supp. Tab 43B. Another internal memorandum, sent to all managers, explained additional factors: "You have 'Reasonable Cause' if you've seen them buy multiple pairs on other occasions in the past, and you believe they are participating in accumulating Levi products." *Id.*

Appellant Mokhtar Al–Saeed was also an agent for a dealer. For several months he bought Levi's and turned them over to the dealer for resale. Ms. Al–Saeed testified that he was paid $2.00 a pair by the dealer, and that he averaged $500 a month in earnings for this practice. Tammy Al–Saeed Depo. at 26. Mr. Al–Saeed was sometimes joined by his wife and by her brother and his wife, in making purchases of multiple pairs of Levi's on behalf of the dealer. They purchased Levi's at J.C. Penney, Lamont's, Mervyn's and the Bon Marche, as well as Fred Meyer. In total they probably purchased about 800 pairs of Levi's over a period of three months, May to July 1996. Tammy Al–Saeed Depo. at 26, 42; E.R. Tab IV, at 4. Tammy Al–Saeed, her brother, Daniel Bates and Daniel's wife, Rachel Bates, are all Caucasians.

Mokhtar Al–Saeed testified that on March 22, 1996, Eva Hoy, an employee at the Raleigh Hills Fred Meyer refused to sell him four or five pairs of jeans. E.R. Tab VI.C, at 109. He testified that she told him that he appeared to be a dealer. *Id.* However, Ms. Hoy has no recollection of having done this. Hoy Aff. at 2. Mr. Al–Saeed also testified that on May 18, 1996, and July 2, 1996, he, his brother-in-law and his sister-in-law all attempted to purchase Levi's and were refused by employees Mary Boyer and Tracy Kaufman. E.R. VI.C, at 131–135. However, neither Ms. Boyer nor Ms. Kaufman has any recollection of having done so. Kaufman Aff. at 2. Mr. Al–Saeed also claimed that he went to the store to buy four or five pairs for his brother overseas, not for a reseller. E.R. VI.D, at 108; E.R. Supp. 43K, at 1. Tammy Al–Saeed testified that no one at Fred Meyer ever told her that her husband's ethnic background or national origin had anything to do with whether he would be allowed to purchase Levi's. Tammy Al–Saeed Depo. at 44. Mr. Al–Saeed did not admit that he was representing a dealer or reseller on those days. E.R. VI.C, at 131–135. However, he did admit that he had been an agent of a dealer since May 1997.[5] Furthermore, his wife admitted that they saw the Levi's policy sign regarding resellers so they knew Fred Meyer had a policy against selling to dealers. Tammy Al–Saeed Depo. at 34.

He also testified that on March 31, 1996, employee Laurie Buck at the Walker Road Fred Meyer store, refused to allow him to return two pairs of Levi's. E.R. Tab VI.C, at 116–117. However, the evidence shows that Laurie Buck was working at a Fred Meyer store in Anchorage, Alaska on that date. E.R. Supp. Tab 43.O. Al–Saeed testified that on March 31, 1996, Shawnee Polasky, a Fred Meyer employee at the Beaverton store, refused to permit him to return two pair of Levi's. However the evidence shows that Shawnee Polasky was working in Vancouver, Washington on March 31, 1996. E.R. Supp. Tab 43.P.

In April 1995, Appellant Ghassan Abu Hemdeh testified that he went to four Fred Meyer stores as the agent of a dealer. Hemdeh Depo. at 32. Two of the four stores he went to refused to sell him Levi's. Although Mr. Hemdeh contends that one of the employees who refused to sell to him was Michael Scaffone, Fred Meyer denies that Michael Scaffone was an employee at that time. The other employee who refused to sell to Mr. Hemdeh was unidentified, but Mr. Hemdeh has stated that she took the Levi's out of his hand and told him she would not sell to him. However, Mr. Hemdeh's race or national origin was not mentioned on either occasion. Mr. Hemdeh had shopped at

---

5. Mr. Al–Saeed admitted in his deposition:
   Q: So you're dealing without an export license and without a business license?
   A: I never been [sic.] a dealer.
   Q: You just told me you've been a dealer since May of '97.
   A: No I wasn't. I was an agent.

   Q: There's no difference, sir. You know it. You know that don't you?
   A: I don't know.
   Q: Are you being as honest as you can be?
   A: Yes, I swear to that. . . .
   Mokhtar Al–Saeed Depo. at 62.

Fred Meyer on previous occasions and has returned since. He has had no problems purchasing items other than Levi's from Fred Meyer.

## II.

■ Our analysis begins with a recognition that § 1981 gives all citizens of the United States "the same right in every State or Territory *to make and enforce* contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981. This has been interpreted to prohibit not only discriminatory government interference with private contracts but purely private discrimination in contracts. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *see Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

Appellants contend that Fred Meyer violated their rights under this statute by depriving them of the opportunity to enter into contracts for the purchase of Levi's and emphasize that Fred Meyer has not deprived them the right to purchase any product other than Levi's. Appellee responds that Appellants misrepresented themselves as ultimate consumers of the Levi's when they were agents of resellers. It is admitted that each Appellant was not an ultimate consumer, but was in fact an agent of a dealer who intended to resell the Levi's.

■ For there to be a violation of § 1981, the plaintiffs must first prove that they have been denied the right "to make and enforce contracts." Of course, "the loss of an opportunity to enter into a *void* contract-i.e., a contract that *neither* party can enforce-is not an injury cognizable under § 1981, for a void contract is a legal nullity." *Fair Employ. Council v. BMC Marketing Corp.,* 28 F.3d 1268, 1271 (D.C.Cir.1994). We must inquire whether Appellants' deliberate misrepresentation of their customer status-representing that they were ultimate consumers when in fact they were agents of resellers, a representation made in full knowledge of the prohibition of sales to dealers, the announced policy of Levi Strauss Company and its retailers-denied them an opportunity to enter contracts within the meaning of § 1981. We are satisfied that any attempt by Appellants to purchase Levi's under the circumstances presented here was an attempt to enter into a voidable contractual relationship that does not present an injury recognized under § 1981.

## III.

■ The Restatement of the Law of Contracts furnishes guidance here. A misrepresentation as to the character of a proposed contract prevents formation of a contract. Restatement (Second) of Contracts § 164(1) (1979).

If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.

*Id.* Section 162 describes when a misrepresentation is fraudulent or material:

(1) A misrepresentation is fraudulent if the maker intends his assertion to induce a party to manifest his assent and the maker

(a) knows or believes that the assertion is not in accord with the facts, or

(b) does not have the confidence that he states or implies in the truth of the assertion, or

(c) knows that he does not have the basis that he states or implies for the assertion.

(2) A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.

Restatement (Second) of Contracts § 162 (1979).

Moreover, it has been held that "the rule that contracts obtained through misrepresentation are merely *voidable* rather than

void seems designed entirely to protect the *target* of the misrepresentations. We conclude, therefore, that the loss of the opportunity to enter into a contract voidable at the other party's will is not cognizable under § 1981." *Fair Employ. Council*, 28 F.3d at 1271. By analogy, it has been held that "a job obtained by an admitted and material misrepresentation is not a property right upon which a constitutional suit can be founded," *Kawitt v. United States*, 842 F.2d 951, 953 (7th Cir.1988).

█ Our holding here is not that Appellants lack Constitutional standing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), but that § 1981 does not recognize an injury where a plaintiff was refused the privilege of entering into a contract in which plaintiff fraudulently misrepresented a material fact to the defendant. Because of plaintiff's fraudulent misrepresentation such a contract, if entered into, would have been voidable at the option of the defendant. Congress could have elected to grant standing to plaintiffs to sue when they were denied such a voidable contract. For example, any person, regardless of their intention to enter a contract to buy or rent a home, has the right to accurate information about rental housing under the Fair Housing Act of 1968. 42 U.S.C. § 3604(d). The Supreme Court upheld this provision giving "testers" the right to sue even in the absence of an enforceable contract. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). However, Congress made no similar allowance in § 1981.

## IV.

It is against these precepts that we analyze the ten claims of discrimination asserted by Appellants. Claims one, two, three and six through ten were brought pursuant to § 1981, alleging Appellants they were denied the opportunity to enter into a contract to purchase Levi's. Their fourth and fifth claims allege that Fred Meyer employees at its Walker Road and Beaverton stores improperly refused to allow Al–Saeed to return a pair of Levi's on March 31, 1996.

█ As a preliminary matter, Appellant Al–Saeed has admitted that at the time of his attempted purchases and the return of his wife's purchase, he was a reseller, not an ultimate consumer.

Q. They knew you were a reseller?

A. Yes.

Q. You bet. So instead you would have other people go in there.

A. Yes.

Al–Saeed Depo. at 105.[6] Responding to Fred Meyer's "Concise Statement of Material Facts," Addisu admitted that he was an agent of a dealer. E.R. Supp. Tab 43, at 3; Tab 52 at 2.

## A.

As to Addisu's first claim, the alleged refusal by employees at Fred Meyer's Gilsan store to sell jeans to him on October 10, 1996, Fred Meyer's employee believed Addisu to be an agent and told him so. Addisu, in fact, was a reseller, by his own admission, and he was attempting to purchase jeans for a reseller on that day. E.R. Tab VI.B, at 83–87; E.R. Supp. Tab 43D, at 1.

The second claim involved the alleged refusal of a Gilsan Street Fred Meyer employee to sell jeans to Addisu on October 31, 1996. Addisu admitted that he entered the store with a private investiga-

---

**6.** Appellants attempted to create an issue of fact as to whether Al–Saeed was known as a dealer by offering an affidavit from Al–Saeed contradicting his deposition testimony that he was a known dealer. E.R. VI.D, at 2. Generally, a non-moving party may not create an issue of fact for summary judgment purposes by means of an affidavit contradicting that party's prior deposition testimony. *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991).

tor at the behest of his attorney to "set up" his case. E.R. Supp. Tab 43, at 4; Tab 52, at 2. The first employee Addisu encountered gave him the jeans he requested. Addisu then asked her questions about his nationality, told her he had previously been refused service and asked to see the employee who had previously refused him service-all for the purpose of allowing the private investigator to overhear the conversation. That employee, when summoned, recognized Addisu as an agent of a dealer and took the jeans from him. Addisu acknowledged in his deposition that the only time he had a problem with Fred Meyer was when he attempted to buy jeans as an agent of a dealer. He had no difficulty at any time with making other purchases at Fred Meyer.

The third claim alleges that an employee of Fred Meyer's Raleigh Hills store refused to sell jeans to Al–Saeed. Al–Saeed testified that the employee refused to sell him the jeans because he appeared to be a dealer. The Fred Meyer employee would have had reasonable cause to suspect that plaintiff Al–Saeed was a dealer, given that he was with another person and was purchasing five to six pairs of jeans and no other items. This ran counter to the Fred Meyer policy. However, he testified that he went into the store with his wife intending to buy four or five pairs for his brother overseas. He did admit that he was an agent for a dealer and his wife admitted that they were agents during the relevant time period.

Al–Saeed's sixth, seventh and eight claims allege that defendant discriminated against him because its employees refused to sell him jeans at its Tigard, Spokane and Peninsula stores on July 4, June 15 and May 18, 1996. It is undisputed that during that time period, Al–Saeed was working as an agent for a dealer and that during this time period he bought approximately 800 pairs of jeans for resale. He was known by the stores as an agent of a dealer.

We conclude that Addisu's first and second claims and Al–Saeed's third, sixth, seventh and eighth claims are not cognizable under § 1981 because as agents of dealers, or as dealers, on each occasion they attempted to enter into a contract of purchase that was based on a fraudulent misrepresentation, to-wit, that they were ultimate consumers when in fact they were resellers. Unlike Addisu, Al–Saeed did not admit he was buying jeans for a dealer on the days in question in the third, sixth, seventh and eighth claims. In fact, he claimed that on one occasion he was intending to buy the jeans as a gift for his brother. However, Al–Saeed did admit that he was a dealer during the relevant period. Fred Meyer's policy states that "[u]nder no circumstances are any pairs of Levi's jeans to be sold to any known dealers, wholesalers, other retailers and or agents representing them." Note 4. Even if he intended to purchase the jeans for personal use, he fell within Fred Meyer's prohibition because he was a dealer. Thus, he attempted to enter into a contract of purchase that was based on the fraudulent misrepresentation that he was not an agent of a reseller. To hold otherwise would require Fred Meyer employees to determine on each occasion whether the resellers intended to buy the jeans for personal use or to resell them, a seemingly impossible task.

In *Fair Employ. Council v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C.Cir.1994), a number of African American "testers" sought job referrals from a District of Columbia job referral service. The referral service discriminated against the black testers. The D.C. Court of Appeals held that while the organization had standing to sue, the black testers did not because they gave inaccurate information to the referral service, to wit, that they would accept a job. They actually had no intention of accepting a job offer. The court held that because their false representations would create a voidable contract, the testers lacked standing under § 1981. *Id.* at 1270–1271. Here, much like in *Fair Em-*

*ploy. Council,* the plaintiffs attempted to enter into voidable contracts; therefore, they do not have standing under the § 1981 "make and enforce" provision.

The Supreme Court has held that an employer who fires an employee for an illegitimate reason may not cure the defect by later discovering a legitimate reason to fire her. *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 359–360, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). In *McKennon,* the plaintiff claimed that the defendant fired her for being 62 years old, an impermissible motive under the Age Discrimination in Employment Act. *See id.* at 357–359, 115 S.Ct. 879. After she was fired, the company discovered that McKennon had committed a number of violations of company policy for which she could be terminated. *See id.* at 359, 115 S.Ct. 879. However, the Court determined that because "McKennon's misconduct was not discovered until after she had been fired[,][t]he employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason." *Id.* at 359–360, 115 S.Ct. 879.

We distinguish *McKennon* because it construes the ADEA, not § 1981. The ADEA provides that it is unlawful for any employer to "discharge any individual ... because of such individual's age." It makes the very act of discharge unlawful if it relates to a person's age. By contrast, § 1981 provides all persons "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." Appellants attempted to obtain the seller's consent to sale by a fraudulent and material misrepresentation. The loss of an opportunity to enter into such a voidable contract is not an injury cognizable under § 1981.

### B.

▬ In the ninth and tenth claims, Appellant Ghassan Abu Hemdeh alleged that Fred Meyer's employees at its Hollywood West and Division stores refused to sell him jeans in April 1995. We conclude that these claims are barred by the applicable statute of limitations. Because there is no specifically stated or otherwise relevant federal statute of limitations for a cause of action under 42 U.S.C. § 1981, the Supreme Court teaches that we must utilize the most analogous state statute of limitations, *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–661, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), and that § 1981 claims are governed by the state statute of limitations governing personal injury actions. 482 U.S. at 661–662, 107 S.Ct. 2617. Because Oregon's statute of limitations for personal injury is two years, Appellant's claims are subject to the two-year statute of limitations. Or.Rev.Stat. § 12.110.

Hemdeh alleges that the incidents, which resulted in his claims against defendant, occurred in April 1995. The original complaint was filed on July 21, 1997, and Hemdeh was added as a plaintiff on October 14, 1997. Thus, Hemdeh's claims are barred by Oregon's two-year statute of limitations.

Even if Hemdeh's claims were not time barred, he, like the other Appellants, has not alleged an injury cognizable under § 1981. On the day in question, Hemdeh visited four Fred Meyer stores as an agent of a dealer with the intention of purchasing jeans for resale. Employees at two out of the four stores refused to sell him jeans. Hemdeh claims that Michael Scaffone was the employee at the Division Store. Fred Meyer has no record of Michael Scaffone being an employee at that time.

Hemdeh cannot identify the employee at the Hollywood West store, but states that a female cashier set aside the jeans he had in his hand and told him she would not sell to him. Hemdeh was accompanied by a dealer at the time of these incidents and was purchasing only jeans. Thus, he fell within Appellee's guidelines for suspected agents and dealers. Hemdeh admits that the only time he has ever had a problem with a Fred Meyer store was when he went to a Fred Meyer store as an agent of a dealer to help the dealer violate the store

policy relating to the sale of Levi's. Therefore, Hemdeh does not describe an injury cognizable under § 1981.

## V.

■■■■■ Appellants' second cause of action alleges violation of 42 U.S.C. § 1985(3), which prohibits two or more persons from conspiring to deprive any person or class of persons of the equal protection of the law. The elements of a § 1985(3) claim are: (1) the existence of a conspiracy to deprive the plaintiff of the equal protection of the laws; (2) an act in furtherance of the conspiracy and (3) a resulting injury. *Scott v. Ross,* 140 F.3d 1275, 1284, *rehearing den.,* 151 F.3d 1247 (9th Cir.1998). In view of our determination that Fred Meyer was within its rights in refusing to sell Levi's to Appellants, we conclude also that there was no conspiracy to deprive Appellants of the equal protection of the laws as to claims one through three and six through ten.

## VI.

■■■■■ We are now left with Al–Saeed's fourth and fifth claims alleging that on March 31, 1996, Fred Meyer employees at its Walker Road and Beaverton stores re- fused to allow him to return two pairs of Levi's that had previously been purchased by his wife. Neither employee named by Al–Saeed, as refusing to accept the return of the jeans, was employed at the store in question on the date in question. Laurie Buck, whom Al–Saeed claims refused the return at the Walker Road store, was working at a Fred Meyer store in Anchorage, Alaska on March 31, 1996. Shawnee Polasky, whom Al–Saeed claims refused the return at the Beaverton store, was employed at a Fred Meyer store in Vancouver, Washington on that date.

Al–Saeed's testimony is instructive. He said that on Friday, March 28, 1996 his wife purchased two pairs of Levi's for his own use, but he was dissatisfied with these as "a fashion preference" because he "liked them tighter at the bottom," but these were "baggy on bottom." He decided to return them, not to exchange them for the desired style, but for the purpose of obtaining a cash refund. He said that Fred Meyer employees refused to refund the sales price.[7]

Because the stated Levi Strauss/Fred Meyer policy is anchored on preventing the sale of Levi's to resellers "to ensure the reliability of product availability for all

---

**7.** The following are relevant excerpts of the deposition testimony.

A: My wife, she went to Fred Meyer in Beaverton. Levi's was on sale, so she thought she was going to buy me two Levi's. She bought me two pairs.

Q: Uh-huh.

A: She came home; she gave me the Levi's. I don't like the 501s. I like 550.

Q: It's a different style of jeans?

A: Because I like this tight at the bottom.

Q: So this was a fashion preference?

A: Yeah. I didn't like it. When she brought them home, I said, no, I don't want those. Take them back. We get other ones, tighter.

. . . .

Q: You're now at what counter?

A: The customer service counter.

Q: What happened?

A: Lady came. She give me a dirty look. She said, how can I help you? I said, well, I want to take those back. She said, okay. She said wait one moment, sir. . . . There was another guy standing next to her.

. . . .

A: He looked at me funny. He was late 20s with a thread tie. He looked at me funny. He looked at the receipt, and he said, how about if I give you 15 bucks for it?

Q: How much had you paid for these?

A: I paid 29.99 for each. He said, what if I give you 15 bucks for it.

. . . .

Q: 15?

A: Yeah. I said, no, thank you, sir. I'll take them back to Beaverton store. Maybe—that's where my wife, she bought it. Maybe they will be nice to me and they take it back.

Q: Did you say anything else to him?

A: No. I just left.

. . . .

Q: So you went up to whom, again, now? This is in the Beaverton you went up to—

A: To this lady. She—

. . . .

Q: State her name again.

shoppers, which may generate repeat visits and boost your business with loyal consumers," the act of returning the jeans for a refund would not offend the policy. There being evidence that Fred Meyer has a liberal exchange or refund policy if the returned goods are in the same condition as they were when purchased, the anti-reseller policy would not be applicable to a reseller's effort to return merchandise. Nor do we perceive that the element of misrepresentation that undergirds the concept of obtaining a contract through misrepresentation when purchasing jeans is present when the contract involves returning the goods for a cash refund. The objective of voiding a contract based on misrepresentation is to protect the target of the misrepresentation, in this case, to ensure that the retailer's supply of jeans is not unnecessarily depleted. To return pairs of Levi's is to augment and not to deplete the retailer's supply.

We must now determine whether, on the basis of Al–Saeed's affidavit and Fred Meyer's documentary support of its summary judgment motion, there exists a genuine issue of material fact. If Al–Saeed's affidavit contains only a scintilla of evidence or evidence that is merely colorable or not significantly probative, it is not sufficient to present a genuine issue of material fact. *United Steel Workers*, 865 F.2d at 1542.

To be sure, Al–Saeed's evidence is not impressive. It is internally inconsistent in that he testified that he was not satisfied with his wife's purchase of the relevant two pairs of jeans because the trouser legs were too "baggy" and not "tight" and that, therefore, he intended to exchange them. Yet when he appeared at two Fred Meyer stores he did not seek an exchange of merchandise, but a cash refund. Moreover, he identified the defaulting Fred Meyer salespersons by name, although Appellee presented evidence that these sales people were not present at either of the stores.

Although on balance the evidence is far from being impressive and any damages sustained apparently would be *de minimus*, we conclude that Appellant Al–Saeed presented a minimum quantum of evidence to create a genuine issue of material fact on claims four and five. This evidence was sufficient to have a fact finder resolve the contradictions present on this very limited issue involving the return of two pairs of jeans of a retail value of $29.99 each.

We will therefore reverse the grant of summary judgment on claims four and five only and affirm the judgment on claims one through three and six through ten. Each side should bear its own costs.

AFFIRMED in part, REVERSED in part. Each side to bear its own costs.

A: Shawnee Palowski. She said, yes, can I help you, sir? I said, well, I have these two pair of Levi's. I want to take them back, and I would want my money,
Q: What did she say?
A: She said—she asked the other guy. There was another guy next to her. They talked a little bit. And then she just came to me. She said, sir, we can't take those back. She said, what did you get those from? I said, well, my wife, she bought them here Friday. She said, how many pair of Levi's you get? I said, my wife, she bought me those two. She said, well, I can—she was very apologetic. We don't take Levi's back. I said, thank you very much. I walked out the door, and I went to get my wife. I told my wife the story.

She said, okay, I'll—drop me by the Beaverton store, and I'll take them back. I park outside; my wife walked in. Didn't take even take like nine minutes, she came out with the money.
Q: And what did she return? What did she bring?
A: She returned the two pair of jeans, the Levi's. She took the receipt with her. They took the receipt from her, and they gave her the money back.
Q: Were these the identical receipt and pairs that you tried to return?
A: The same receipts. Same receipt and the same pairs of Levi's.
Al–Saeed Depo. at 114–115, 119–120, 122–124.