**NORTHSTAR TREKKING LLC, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**United States of America, Counterclaimant,**

v.

**Northstar Trekking, LLC, Counter-defendant.**

**No. 5:07–cv–00003–JWS.**

United States District Court, D. Alaska.

May 4, 2009.

Aaron R. Maurice, Bryan D. Dixon, R. Glen Woods, Woods Erickson Whitaker & Maurice LLP, Henderson, NV, H. Clay Keene, Keene & Currall, P.C., Ketchikan, AK, for Plaintiff.

Jeremy Nolan Hendon, Karen L. Pound, Washington, DC, for Defendant.

Aaron R. Maurice, Bryan D. Dixon, R. Glen Woods, Woods Erickson Whitaker & Maurice LLP, Henderson, NV, H. Clay Keene, Keene & Currall, P.C., Ketchikan, AK, for Counter-defendant.

## ORDER AND OPINION

[Re: Motion at Docket 35]

JOHN W. SEDWICK, District Judge.

### I. INTRODUCTION

In 2004, the IRS decided that NorthStar Trekking, LLC ("NorthStar") owed the Air Transportation Excise Tax for flight-seeing charters it had flown during the second and third quarter of 2002.[1] The IRS assessment gave no credit for North-Star's payment of the Aviation Fuel Excise Tax, but imposed interest and penalties for failure to pay the Air Transportation Excise Tax.[2] NorthStar protested the assessment, paid a portion of the taxes the IRS claimed were due, and requested a refund, arguing that it was exempt from taxation because it operated helicopters of 6000 pounds or less, that its flight-seeing charters were not operated on an "established line," and that NorthStar had no duty to collect and pay any such taxes.[3]

On May 22, 2007, NorthStar filed its complaint in this case claiming that the Internal Revenue Service wrongfully assessed taxes against it for the second and third quarters of 2002. The defendant filed an answer, and a counterclaim seeking back taxes, on July 30, 2007.

NorthStar has now filed a motion for summary judgment, the United States has responded, and NorthStar has replied. Oral argument was not requested and would not assist the court. The issue is whether the flights offered by NorthStar are taxable flights under 26 U.S.C. § 4261 because flown on "established lines," or exempt from the Air Transportation Ex-

---

**1.** Doc. 4 at p. 8 (Gov.Answer/Counterclaim); Doc. 36–2 (Exhibit 1); Doc. 39–2 (Pound Declaration); Doc. 39–5 (Gov. Exhibit 1); Doc. 39–5 (Gov. Exhibit 2).

**2.** Doc. 1–3 (Exhibit B); Doc. 1–4 (Exhibit C); Exhibit 36–9 (Exhibit 8).

**3.** Doc. 36–3 (Exhibit 2); Doc. 36–3 (Exhibit 3); Doc. 36–9 (Exhibit 8); Doc. 36–19 (Exhibit 16); Doc. 42–7 at p. 28 (Day Depo).

cise Tax as provided under 26 U.S.C. § 4281 [4] because not flown on established lines.

## II. BACKGROUND

The relevant facts are not disputed. NorthStar, a company specializing in air tours and glacier treks, was founded in 1998 by Bob Engelbrecht, who has been working with and operating helicopters in Alaska since the early 1980s. NorthStar holds an Air Carrier Certificate from the Federal Aviation Authority (FAA) under Part 135 of the FAA Regulations, authorizing it to operate charter flights, but not regularly scheduled flights. NorthStar, in fact, operated only charter flights, and did so only at the request of its customers.

NorthStar offered glacier treks which allowed its passengers to explore the Juneau Ice Field at varying degrees of difficulty, equipped with crampons, helmets and ice axes, under the supervision of trained mountaineering guides. The Juneau Ice Field is comprised of approximately 1,500 square miles of glaciers. NorthStar flights landed on the Mendenhall, Taku, Norris, Gilkey, Lemon Battle, Theil, and Hole in the Wall glaciers, depending upon weather and glacier conditions. There are twenty-two different specified landing zones. NorthStar offered charters of its aircraft on an hourly basis. It also offered flight-seeing tours on a per seat basis which required payment for a minimum of three seats. The flights were operated only on the demand of NorthStar's customers, and if there were insufficient demand, NorthStar did not fly.

NorthStar provided flight-seeing charters to cruise ship passengers through its contracts with the cruise lines. The cruise lines, not NorthStar, offered the tours to the cruise ship passengers. In fact, the information provided to the cruise lines'

customers does not normally contain the name of the tour operator. The cruise lines marked up the price of the tours to their passengers, and NorthStar was not entitled to determine what the passengers were charged for the tours. The cruise lines then paid a set agreed-upon rate to NorthStar. The Air Transportation Excise Tax was not included in the amount paid by the cruise lines to NorthStar.

NorthStar's flights operated frequently during the summer tourist season, from May through September, and if all their available seats were sold, they ran on the hour and the half-hour, using three or four helicopters seating six passengers each. Occasionally, tours ran when there was no ship in town, but only if there was a customer. Cruise ship passengers made up about 90 percent of NorthStar's flight-seeing business. All of NorthStar's available seats were usually dedicated to the cruise ships when they were in port. NorthStar also marketed its tours to the public at large who could book tours through dockside vendors. However, if a ship were scheduled to be in port, NorthStar might not know whether it would have seats available until the last minute, so non-cruise passengers would have to wait until the day of the flight to know whether space would be available.

In 2002, NorthStar offered three tours to cruise ship passengers. The "core" tour was called the "glacier trek," and involved about a half an hour in the helicopter and about two or two and a half hours with a NorthStar professional mountaineering guide on a glacier. For that tour, the helicopter either remained on the glacier for the two hours, or returned to base, depending upon whether it was needed for another tour. Another tour offered by NorthStar was an extended glacier trek. This tour was basically the same as the core tour, but allowed for about four hours

---

4. *See* Doc. 36–2 at p. 16 (Exhibit 1).

on a glacier. The third tour offered was called the "glacier discovery tour," which lasted an hour, including 30–35 minutes in the helicopter, and a short time on the glacier with the pilot.

The tours ran out of Juneau, and they began and ended at the same heliport. The routes flown differed from day to day, depending on the time frame, the weather, the views, and the glacier upon which the helicopter was to land, as specified by the cruise companies. The landing sites varied from day to day among four or five different glaciers and different spots on each glacier. Usually, the passengers were dropped off and picked up at the same spot.

NorthStar and the cruise lines entered into contracts in which NorthStar agreed to offer the cruise ships a certain number of seats for particular tours at particular departure times—allocations or allotments—before the season started, and the seats were held for the cruise ship until the time the tour actually departed from the dock. If a cruise ship needed more seats or wanted another type of tour, NorthStar would usually try to accommodate it. NorthStar and the cruise lines were able to accept or reject any specific tour or price during their negotiations.

The cruise lines controlled when the ships arrived and departed. NorthStar scheduled its tours to begin after a cruise ship arrived in port and to end before the ship departed. NorthStar's charters ran as required by the needs of the cruise lines, including accommodating the last-minute final number of passengers for the various tours, and working around late arrivals. NorthStar provided guides, and paid for any necessary licenses or permits. The cost of doing so was built into the price of the tour. NorthStar arranged for a bus company to transport passengers from the dock to the helicopters for most of their tours.

NorhtStar pilots had actual control over the precise routes flown by the helicopters and the specific landing sites used. This reflected the ever changing glacier conditions and safety concerns. However, the tours for cruise ship passengers were operated generally as agreed upon with the cruise lines. Deviation from the generally agreed routes, destinations, and a cruise ships' time requirements would be viewed as a breach of contract by NorthStar. For instance, because the contract with the cruise lines called for 30 minutes in the helicopter, if a glacier landing was closer than a 15–minute flight, the pilots spent more time in the air, taking a less direct route, in order to comply with the contract's requirements. Were a cruise ship passenger to ask NorthStar to fly to a destination other than the one set for the tour, NorthStar would be unable to honor the request, because it was required to fly as agreed with the cruise line.

NorthStar's flight-seeing tours were conducted on helicopters weighing less than 6000 pounds. During the period in question, NorthStar paid the Aviation Fuel Excise Tax, rather than the Air Transportation Excise Tax.

## III. STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law."[5] The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact.[6] The

---

5. See Fed.R.Civ.P. 56(c)

6. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Court must view all evidence and draw all inferences therefrom in the light most favorable to the nonmoving party.[7] The burden then shifts to the nonmoving party to "set forth specific facts demonstrating that there is a genuine issue for trial."[8] However, there must be more than a mere "scintilla of disputed evidence."[9] As explained by the Supreme Court, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."[10]

## IV. DISCUSSION

### A. Exemption from Air Transportation Excise Tax

As previously noted, the question here is whether NorthStar's flights were operated on an "established line" under 26 U.S.C. § 4281.[11] If so, NorthStar was subject to the Air Transportation Excise Tax. Otherwise, it was exempt.

Section 49.4263–5 of the Treasury Regulations provides:

The term "operated on an established line" means operated with some degree of regularity between definite points. It does not necessarily mean that strict regularity of schedule is maintained; that the full run is always made; that a particular route is followed; or that intermediate stops are restricted. The term implies that the person rendering the service maintains and exercises control over the direction, route, time, number or passengers carried, etc.

### 1. Regularity

Both parties cite *Lake Mead Air, Inc. v. United States*, 991 F.Supp. 1209, 1212 (D.Nev.1997). There, the court explained that "the crux of the phrase 'on an established line' seems to be that the public can rely on the transportation because of a regularity determined by the provider, not the customer, i.e., the whims of customers do not dictate a particular route."[12] Although this court disagrees with the ultimate decision in *Lake Mead*, this court agrees with that statement. In the case at bar the facts clearly show that it is the customers—the cruise lines—who dictate

---

**7.** *See Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1774, 1775, 167 L.Ed.2d 686 (2007); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000).

**8.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**9.** *Id.* at 252, 106 S.Ct. 2505.

**10.** *Id.* at 248, 106 S.Ct. 2505.

**11.** *See* H.R. Rep. 91–601 at 3047 (1969) ("The principal purpose of this legislation is to provide for the expansion and improvement of the nation's airport and airway system."). In 2005, the statute was amended to state that "an aircraft shall not be considered as operated on an established line at any time during which the aircraft is being operated on a flight the sole purpose of which is sightsee-

ing." NorthStar argues that this amendment was made to clarify the intent of the statute in effect at the time in question. *See* 149 Cong. Rec. S1978–01 & 151 Cong. Rec. S146–01 (2005) ("The Congress did not intend to have the tax applied to air tour operators, who utilize our system of airways differently. Our national transportation system receives little or no benefit from aerial sightseeing operations. Air tour operations are not scheduled commercial airlines. They are for entertainment purposes and are circular, in that they begin and end at the same destination point."). The Government does not dispute this analysis of that legislative history, but states that this legislative history is not from the original statute. The Government, however, does not cite legislative history from the original statute to contest NorthStar's analysis. *See* Doc. 35 at pp. 13–14; Doc. 39 at pp. 22–23; Doc. 41 at pp. 5–6.

**12.** *Lake Mead Air*, 991 F.Supp. at 1212.

the duration, destination, and general route of the flights.

The United States argues that North-Star would have run its flights regardless of its contracts with the cruise ship companies, because NorthStar also offered its tours to the general public.[13] However, given that approximately 90 percent of NorthStar's business came from the cruise lines, this argument is not persuasive. In fact, it seems unlikely that there would have been such a business in the first place were it not for the cruise lines' passengers. Even if NorthStar had been able to operate with a much reduced customer base, it would be speculative at best to decide the case actually presented based on one possible business model which might have been used were the facts other than as they are. Finally, it may be noted that there is no evidence that regularly-scheduled flights were ever advertised to the general public.

The United States also argues that because someone was usually in NorthStar's office from 7 a.m. to 9 p.m. during the summer season, the regularity requirement was met. Having someone in an office to accommodate the business of the cruise lines and any walk-in customers does not equate to having a regular flight schedule driven by NorthStar, rather than by its customers.[14] The United States' contention that unless NorthStar had a "sporadic operation," [15] it could not have operated on the demand of its customers flies in the face of common sense and the record in this case. For example, as out-lined above, NorthStar did not know until the night before a flight how many flights would be flown for the particular cruise ship(s) coming into port.

### 2. Control

Although the individual pilots had physical control over the helicopters in flight, especially when it came to safety issues, the customers had control over the tours' destinations, times, and general routes. Any significant deviation would be considered a breach of NorthStar's contracts with the cruise lines. In sum, the facts establish that the customers, rather than NorthStar, had "control" over the charters.[16]

The conclusion is further supported by reference to Revenue Ruling 62–617, 1972–2 C.B. 580 at p. 1 which provides:

> An air taxi operator of an aircraft having a maximum certificated takeoff weight of less than 6,000 pounds entered into a contract with the United States Postal Service to provide overnight air mail service between two cities. The aircraft did not operate between these two cities before this contract was entered into. The contract provides for a mail service rate based on six regularly scheduled round trips weekly between the hours of 11:00 p.m. and 3:30 a.m. In addition to maintaining control over the flight schedule, the Postal Service has exclusive use of the aircraft with respect to the six round trips.
>
> . . .

---

13. Doc. 39 at p. 13; *see also Lake Mead Air,* 991 F.Supp. at 1213.

14. *See, e.g.,* Doc. 36–7 at pp. 24 –25 (Although Jason Kulbeth was a pilot who had regular employment with NorthStar, he only flew for NorthStar when there was passenger demand).

15. Doc. 39 at p. 14.

16. *See* 26 C.F.R. § 49.4263–5; *see also* Rev. Rul. 62–617, 1972–2 C.B. 580 ("the aircraft making the flights is not operated on an established line because the carrier has not retained control over the direction, route, time, or cargo carried. The arrangement between the Postal Service and the operator of the aircraft is, in effect, a charter of the aircraft.").

... the aircraft making the flights is not operated on an established line because the carrier has not retained control over the direction, route, time, or cargo carried. The arrangement between the Postal Service and the operator of the aircraft is, in effect, a charter of the aircraft, a so-called 'wet lease.'

Other than the issue of exclusivity of use, the situation described in the revenue ruling is not materially different from NorthStar's case. The United States argues that because NorthStar could include cruise ship and walk-in customers on the same tour, no one customer could have control. This is not supported by the evidence. The fact is that the contract with the cruise line controlled when and where the tour went, regardless of whether there were also non-cruise ship customers on the flight. NorthStar could not deviate from its agreed-upon tour for a cruise line in order to accommodate the desires of any particular non-cruise customer; and a non-cruise customer would have to confirm on the day of the tour, when a cruise ship was in port.

The United States also argues, citing *Lake Mead Air,* that because NorthStar could negotiate its contracts with the cruise lines, it had such control over the tours that it was on an established line.[17] This court disagrees. Although NorthStar could refuse to take anyone on its tours, and was free to contract with the cruise lines and other customers as it saw fit, once there was a contract, NorthStar was required to abide by that agreement. It

was not allowed to take the cruise ship passengers wherever it wished. NorthStar flew only if, when, and where its services were contracted.

### 3. *Between Definite Points*

Unlike flights by commercial airlines between cities, it is undisputed that the flight-seeing charters included landings on various glaciers, and that the locations of glacier landings varied depended upon weather conditions, changing surfaces, Forest Service restrictions, the current snow line, etc. The United States argues that taking off, and ultimately returning to, the same airport satisfies the "between definite points" requirement, effectively treating the glacier landings as intermediate stops on a fixed route. While intermediate stops may exist on and do not alter the character of an "established line," in this case the stops on the glaciers **were** the destinations. The passengers were specifically paying to see the glaciers upon which the helicopters landed, and to engage in sightseeing and other activities on the glaciers, often for hours. Getting to the place where the helicopter landed was the purpose for the flight, rather than merely an "intermediate stop" en route to some other place.

The United States also argues that because there were only a limited number of glaciers upon which NorthStar landed, the flights were operated "between definite points."[18] The United States, however, does not cite any support for this argument,[19] and is either ignoring, or unaware

---

17. Doc. 39 at pp. 15–18; *Lake Mead Air,* 991 F.Supp. at 1213.

18. Doc. 39 at p. 19.

19. Doc. 39 at pp. 18–19. The Court disagrees with the decision in *Lake Mead Air* to the effect that, in order to be exempt, a carrier must act as a taxi does on the ground. "Most taxis do not even have a point of origin; they just travel the streets searching for fares.

Conceivably, an air taxi would start at a specific landing field and land where the customer directed; thus, it would have, at most, one definite point. On the other hand, Lake Mead's tours started and ended at the same point without fail, so its flights were between definite points." *Lake Mead Air,* 991 F.Supp. at 1213. In addition, there is no indication in Lake Mead Air that the flights were to specific

of, the size of the glaciers.

### V. CONCLUSION

Under 26 U.S.C. § 4281, NorthStar's helicopter tour business is exempt from the Air Transportation Excise Tax. The flights at issue are controlled by North-Star's customers. Any perception of a patterned schedule arises from the demands of the customers, not NorthStar's establishment of a particular "line." Flights destined for various locations on an icefield which allowed passengers to get out to engage in activities on a glacier are not flights conducted "between definite points." NorthStar's motion for summary judgment at docket 35 is **GRANTED.**

destinations at which the aircraft landed with- in or on the rim of the Grand Canyon.